Mildred JAMISON, et al., Respondents,

v.

STATE of Missouri, DEPARTMENT
OF SOCIAL SERVICES, DIVISION
OF FAMILY SERVICES, Appellant.

No. SC 87360.

Supreme Court of Missouri,
En Banc.

March 13, 2007.

Jeremiah W. (Jay) Nixon, Atty. Gen., Joel E. Anderson, Asst. Atty. Gen., William R. Kennedy, Asst. Atty. Gen., Scotty L. Allen, Jefferson City, for Appellant.

Timothy Belz, St. Louis, for respondents.

LAURA DENVIR STITH, Judge.

The Division of Family Services [1] of Missouri's Department of Social Services ("division") appeals the trial court's order granting summary judgment to Ms. Mildred Jamison and Ms. Betty Dotson in their declaratory judgment action seeking to have the Missouri Child Abuse Act, section 210.110 et seq., RSMo 2000,[2] ("the Act") held unconstitutional, facially and as applied, under the due process clauses of the United States and Missouri constitutions. The trial court found that the Act violates "the due process rights of all persons ... whose names are included in the Central Registry prior to their opportunity for a due process hearing."

This Court agrees that Ms. Jamison and Ms. Dotson have shown they have a protected liberty interest in not having their names included in the Central Registry and subject to dissemination to current and prospective employers before they receive notice and an opportunity to be heard. For these reasons, to the extent that the Act permits the division to list the names of persons in the Central Registry based on the findings of an investigator and local director, it is invalid because it does not provide alleged perpetrators with the necessary notice and opportunity to be heard. Similarly, to the extent that the Act permits listing persons in the Central Registry merely based on a finding by an investigator, a local director, or the CANRB of probable cause to believe abuse or neglect occurred, it is invalid. Unless and until the CANRB determines that the allegations are proven by a preponderance of the evidence, the division cannot constitutionally include the alleged perpetrators in the Central Registry.

The trial court held that to pass constitutional muster the alleged perpetrator must also be guaranteed the right to subpoena and cross-examine sworn witnesses and the rules of evidence must apply in the CANRB hearing. It therefore held the Act unconstitutional in its entirety. Were the alleged perpetrator granted no further right to review, this Court would agree. But the CANRB hearing is a pre-deprivation hearing, from which an aggrieved alleged perpetrator has an immediate right to *de novo* judicial review. This subsequent review renders these additional procedural safeguards unnecessary to satisfy due process. Therefore, the procedural protections provided at the CANRB hearing are adequate if a preponderance of the evidence standard is applied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Ms. Jamison is a registered nurse and the founder and chief executive officer of Faith House, a licensed child care center and residential child care agency in St. Louis. Ms. Dotson is a licensed practical nurse employed at Faith House. On January 2, 2003, an anonymous call made to the division's child abuse and neglect hotline alleged that Ms. Jamison and Ms. Dotson negligently failed to supervise the children in their care.

At that time, the Act provided that if a division investigator "found probable cause to believe ... that the individual has committed child abuse or neglect," sec. 210.110(2), then the individual should be listed in the Central Registry. The Central Registry is a statewide child abuse and neglect registry maintained by the division as part of Missouri's efforts "to promote the safety of children ... [by] providing services in response to reports

---

1. The Division of Family Services is now known as the Family Support and Children's Division. *See* ch. 207, RSMo Supp.2006.

2. All subsequent statutory citations are to RSMo 2000 unless otherwise indicated.

of child abuse or neglect," sec. 210.109.2, RSMo Supp.2006. Although the legislature recently amended the Act to require that an allegation of child abuse or neglect by proved by a preponderance of the evidence before an alleged perpetrator's name is included in the Central Registry, when Ms. Dotson and Ms. Jamison were listed and when they administratively appealed that listing, the Act required only a showing of probable cause to believe they had committed abuse or neglect.

Beginning the day the hotline call was made, a division investigator reviewed documents and interviewed the victims, Ms. Jamison and Ms. Dotson, and several witnesses. On January 29, 2003, the investigator issued her report, finding probable cause to believe Ms. Jamison and Ms. Dotson neglected children under their care. Based solely on the investigation, before any formal notice or a hearing was provided to Ms. Jamison or Ms. Dotson, the division entered the two women's names in the Central Registry as persons there was probable cause to believe were guilty of child abuse or neglect. As a result, the Department of Health and Senior Services ("DHSS") decreed that Ms. Jamison was not allowed to be present during Faith House's hours of operation.[3] The investigator also sent both women letters on January 30, 2003, telling them they were now listed in the Central Registry and informing them of their right to adminis-

trative review before the county director of the local division office under 13 CSR 40–31.025(2).

According to these regulations, the director must review "all appropriate material" and independently determine whether to uphold the investigator's decision. 13 CSR 40–31.025(2)(B). Although "all appropriate material" is not defined and no provision entitles a person to submit a written explanation of the alleged abuse or neglect, in this instance, the director permitted Ms. Jamison and Ms. Dotson to provide affidavits setting forth their versions of the events. In a letter sent on April 3, 2003—64 days after the women were first listed in the Central Registry—the director informed Ms. Jamison and Ms. Dotson that he was upholding the investigator's finding of probable cause and, as required by 13 CSR 40–31.025(2)(C), informed them how to seek further review. During this entire period, Ms. Jamison and Ms. Dotson's names were included in the Central Registry and, therefore, available to inquiring employers. *See* sec. 210.150.

Still believing that the findings against them were incorrect and that their names should not be listed in the Central Registry, Ms. Jamison and Ms. Dotson made a timely, written request for review by the CANRB.[4] *See* sec. 210.152.3; 13 CSR 40–

---

3. A DHSS employee advised Ms. Jamison that DHSS would not take any action to enforce this restriction while the matter was being appealed. Nothing in the Act prohibits DHSS from enforcing the restriction pending appeal should the agency so choose.

4. The CANRB consists of nine members, who are appointed by the governor with the advice and consent of the senate. Sec. 210.153.2. The board *must* include: "(1) A physician, nurse or other medical professional; (2) A licensed child or family psychologist, counselor or social worker; (3) An attorney who has

acted as a guardian ad litem or other attorney who has represented a subject of a child abuse and neglect report; [and] (4) A representative from law enforcement or a juvenile office." *Id.* The other members of the board can be selected from among the following: "(1) A person from another profession or field who has an interest in child abuse or neglect; (2) A college or university professor or elementary or secondary teacher; (3) A child advocate; (4) A parent, foster parent or grandparent." Sec. 210.153.3.

31.025(8)(A). Pending that review, their names remained in the Central Registry.

Under section 210.153.4(2), Ms. Jamison and Ms. Dotson were entitled to appear before the CANRB, with or without counsel, to testify in person or to submit a written statement.[5] Both Ms. Jamison and Ms. Dotson and the division were permitted to present witnesses at the hearing. Sec. 210.153.4(3); 13 CSR 40–31.025(8)(F). Witnesses providing information on behalf of the child were also allowed to attend. Sec. 210.153.4(3). Testimony is not given under oath nor does the law provide for compulsory attendance or cross-examination of witnesses. *See* sec. 210.153; 13 CSR 40–31.025(8). Accordingly, Ms. Jamison and Ms. Dotson did not receive these procedural protections. Additionally, the rules of evidence do not apply to a CANRB hearing, and, thus, hearsay can be considered. *See* sec. 210.153; 13 CSR 40–31.025(8).

The CANRB did not schedule a hearing until July 22, 2003, some three and one-half months after Ms. Jamison and Ms. Dotson received the local director's decision to uphold the probable cause finding. The version of the statute then in effect provided that the CANRB "shall sustain the division's determination if [it] is supported by evidence of probable cause and is not against the weight of such evidence." Sec. 210.152.4. Twenty days later, on August 11, 2003, Ms. Jamison and Ms. Dotson received notice that the CANRB upheld the probable cause finding. This meant Ms. Jamison's and Ms. Dotson's names remained in the Central Registry, just as they had for more than six months.

The statutory scheme permits an alleged perpetrator aggrieved by the CANRB's decision to seek *de novo* judicial review within 60 days, *see* sec. 210.152.5, and Ms. Jamison and Ms. Dotson did so on October 9, 2003. "In reviewing such decisions, the circuit court shall provide the alleged perpetrator the opportunity to appear and present testimony. The alleged perpetrator may subpoena any witnesses except the alleged victim or the reporter." *Id.* Ms. Jamison's and Ms. Dotson's names remained in the registry for the 25 months during which the case was pending in the circuit court. On November 3, 2005, the court ruled that the Act violated the women's due process rights.[6] It found that the statute infringed on their liberty interest in their reputation, nurses' licenses, and ability to seek employment in their chosen profession, without first giving them "a meaningful hearing at a meaningful time." Based on these findings, the court declared the entire Act unconstitutional under both the United States and Missouri constitutions. It stayed its ruling pending appeal.

## II. STANDARD OF REVIEW

■ The case below was tried to the court pursuant to section 210.152. The judgment in a court-tried case will be sustained on appeal unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declared or applied the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

■ Whether a statute is unconstitutional is a question of law, the review of which is *de novo*. *Doe I v. Phillips*, 194 S.W.3d 833, 841 (Mo. banc 2006). Because

---

**5.** By division practice, Ms. Jamison and Ms. Dotson were also invited to participate in a telephone conference call if they could not be physically present.

**6.** The ruling was made on a motion for summary judgment that did not address whether grounds existed to support the probable cause finding of neglect. Thus, at no point did the court consider whether the evidence supported the CANRB's finding.

a statute is cloaked in a presumption of constitutionality, an appellate court may find the statute unconstitutional only if it clearly contravenes a specific constitutional provision. *State v. Kinder,* 89 S.W.3d 454, 459 (Mo. banc 2002). "Nonetheless, if a statute conflicts with a constitutional provision or provisions, this Court must hold the statute invalid." *Id.*

## III. PROCEDURAL DUE PROCESS

### A. Determining What Process Is Due.

▮ The due process clauses of the United States and Missouri constitutions prohibit the taking of life, liberty or property without due process of law. U.S. Const. amend. XIV, sec. 1; Mo. Const. art. I, sec. 10.[7] The United States Supreme Court has long recognized that this prohibition "imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests." *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In determining what process is due in a particular case, a court first determines whether the plaintiff has been deprived of a constitutionally protected liberty or property interest. *Ky. Dep't of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (citations omitted). If so, a court then examines whether the procedures attendant upon the deprivation of that interest were constitutionally sufficient. *Id.*

▮ Under both the federal and state constitutions, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a

meaningful manner.' " *Mathews,* 424 U.S. at 333,, 96 S.Ct. 893 *quoting, Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); *accord, Moore v. Bd. of Educ. of Fulton Public School No. 58,* 836 S.W.2d 943, 947 (Mo. banc 1992). This does not mean that the same type of process is required in every instance; rather, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *accord State ex rel. Cook v. Saynes,* 713 S.W.2d 258, 262 (Mo. banc 1986). Three factors must be considered in determining what procedures are constitutionally sufficient:

[1] First, the private interest that will be affected by the official action; [2] second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [3] finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews,* 424 U.S. at 335, 96 S.Ct. 893; *accord Belton v. Bd. of Police Comm'rs,* 708 S.W.2d 131, 135, 137 (Mo. banc 1986).

The United States Supreme Court has consistently held "that some form of hearing is required before an individual is finally deprived of a [protectable] interest" because "the right to be heard before being condemned to suffer grievous loss of any kind ... is a principle basic to our society.' " *Mathews,* 424 U.S. at 333, 96 S.Ct.

**7.** The parties do not separately analyze the Missouri due process clause. The Court notes that Missouri's due process provision parallels its federal counterpart, and in the past this Court has treated the state and federal due process clauses as equivalent. *See, e.g.,* *State v. Rushing,* 935 S.W.2d 30, 34 (Mo. banc 1996) (Missouri constitutional provisions cannot provide less protection than comparable federal ones); *Belton v. Bd. of Police Comm'rs,* 708 S.W.2d 131, 135 (Mo. banc 1986) (equivalent).

893 (internal quotation omitted). When this hearing must be held and what procedural protections must accompany this hearing will vary depending on the interest at stake.

Applying these principles here, this Court must first decide whether Ms. Jamison and Ms. Dotson have a protected liberty or property interest in not being listed in the Central Registry. If so, then this Court must determine whether the women were provided with notice and an opportunity to be heard at a meaningful time and in a meaningful manner. If this process was inadequate, this Court must determine what alternative or additional protections are necessary to satisfy due process.

### B. Constitutionally Protected Interest: "Stigma Plus" Test

■ The division concedes that making Ms. Jamison's and Ms. Dotson's names available to potential employers and others entitled to view names listed in the Central Registry creates a stigma that is damaging to the women's reputations. *See, e.g., Valmonte v. Bane,* 18 F.3d 992, 1000 (2d Cir.1994); *In the Matter of Application of Anonymous v. Peters,* 189 Misc.2d 203, 730 N.Y.S.2d 689, 693 (2001) (stigma results from listing on child abuse registry). But, as the division notes, stigma alone is insufficient to invoke due process protections. *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). For state action resulting in stigmatization to rise to the level of a constitutionally protected interest, a person must also show that the state action affects some other tangible liberty or property interest. *Id.* This standard is known as the "stigma plus" test. *See, e.g., Valmonte,* 18 F.3d at 999; *In the Matter of Lee TT v. Dowling,* 87 N.Y.2d 699, 642 N.Y.S.2d 181, 664 N.E.2d 1243, 1249 (1996).

■ Ms. Jamison and Ms. Dotson argue that the "plus" element of this test is satisfied because the burden placed on employers who retain or hire those listed in the Central Registry effectively precludes those listed from working in the child care profession. This practical effect arises because of the statutory and regulatory requirements associated with the registry. Although the names contained in the Central Registry are not released to the general public, they are available "to persons who have a right to such information," including businesses and agencies "providing or having care or custody of a child." [8] Sec. 210.150; *see also* sec. 210.921.1 (describing limitations of disclosure of information from the Central Registry).

In fact, all Missouri child care providers are required to use the Central Registry to screen their employees and volunteers to determine whether they have committed child abuse or neglect, 19 CSR 30–62.102(1)(K), and serious ramifications will result if an employer hires or continues to employ a person whose name is in the Central Registry. For example, the DHSS "may prohibit the person from being present in the facility during child care

---

8. The information contained in the Central Registry is also available to physicians treating children they suspect are victims of abuse or neglect; persons involved in the investigation or prosecution of alleged abuse or neglect; licensing authorities; parents and guardians seeking information about a specific child care facility or individual; the alleged victims; the alleged perpetrators; persons with a "bona fide research purpose;" and researchers employed " "at an accredited institution of higher education engaged in scholarly research." Sec. 210.150.2. Further, the Act mandates that "reports and related information pursuant to ... sections 210.109 to 210.183" are public records for purposes of providing background information on child and elder-care workers. Sec. 210.936.2(2), RSMo Supp.2006.

hours," *id.; see also* 19 CSR 30–61.105(1)(K), thereby negating the very purpose for the person's employment at a child care facility. Further, nurses who are listed in the Central Registry are subject to discipline, including loss of license, from the board of nursing. Sec. 335.066.2(15). Similarly, child care providers and similar agencies can be denied or lose their licenses if they employ or retain persons listed in the Central Registry. 13 CSR 40–71.030(1)(A)(5) (licensing of residential care facilities); 13 CSR 40–73.017(1)(A)(5) (licensing of child placement facilities).[9] In addition, state and federal funds for providing in-home child care services can be denied if a care provider is listed in the Central Registry. Sec. 210.025.3(1).

■ These statutory and practical burdens facing a Missouri child care employer effectively preclude an individual listed in the Central Registry from obtaining employment in the child care profession. "[T]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference" implicates constitutionally protected liberty interests. *Greene v. McElroy,* 360 U.S. 474, 492, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). Because child-care employers are required to consult the Central Registry to screen employees, public dissemination necessarily follows inclusion. Thus, listing one's name in the Central Registry "squarely implicate[s] a protected liberty interest" and satisfies the "plus" element of the stigma plus test. *Dupuy v. Samuels,* 397 F.3d 493, 503 (7th Cir.2005); *accord, Anonymous,* 730 N.Y.S.2d at 693.

The division suggests that plaintiffs must show that they have lost their jobs or that their employer has lost its license or funding before a cognizable injury can be shown. As courts in other states have recognized, however, the fact that an entity employing listed persons is subject to losing funding or licensing is itself sufficient to constitute a bar to hiring and to invade the listed persons' liberty interest because no reasonable employer would hire or retain them in these circumstances. For example, the court in *Cavarretta v. Dept. of Children and Family Serv.,* 277 Ill.App.3d 16, 214 Ill.Dec. 59, 660 N.E.2d 250, 254 (1996), found that persons placed on the Illinois child abuse registry "may be prohibited from working in certain professions, such as child care and teaching," because a state statute allowed for revocation or denial of licenses for child care facilities who retain or hire such persons and because an employer who hired such persons faced the possibility of tort liability for negligent hiring should abuse allegations arise. *Cavarretta* found that this bar to employment in one's chosen field implicates a constitutionally protected liberty interest and that the fact that placement of the plaintiff's name in the child abuse registry had yet to result in "an adverse employment decision" was immaterial. *Id.* 660 N.E.2d at 254–55; *see also Valmonte,* 18 F.3d at 998–99, 1002 (petitioner need not "await the consummation of threatened injury to obtain preventative relief").

Similarly, the New Hampshire Supreme Court found that, because the "State may revoke the license of any child day care agency that employs a person listed" in the child abuse registry, listing an individual in the registry implicates a liberty interest by "essentially barr[ing] him from working with children, and caus[ing] him to become

---

9. Although the State notes that nurses are entitled to a hearing before actually losing their nursing license and that an appeal is available after revocation of a facility's operating license, the risk of loss of licenses alone would be enough to make potential employers avoid hiring persons whose names are listed in the Registry.

unemployed and unemployable in his profession." *Petition of Preisendorfer,* 143 N.H. 50, 719 A.2d 590 (1998),

### C. Due Process Requires The Opportunity To Be Heard At A Meaningful Time And In A Meaningful Manner.

Because Ms. Jamison's and Ms. Dotson's liberty interests are affected by their listing, this Court must determine whether the Act's procedures adequately protect their interests. This Court will address each of their claims in turn. In so doing, it is guided by the admonition stated above that a court must weigh three factors when determining what process is required: (1) the private interest at stake; (2) the "risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any" of different procedures; and (3) the State's interest. *Mathews,* 424 U.S. at 335, 96 S.Ct. 893.

### 1. Notice and an Opportunity to Be Heard Are Required Before Inclusion in the Central Registry.

 Ms. Jamison and Ms. Dotson argue the Act is constitutionally infirm because it permits their names to be listed in the Central Registry without first providing adequate notice of the claims or an adequate opportunity to be heard in response. They aver that they are entitled to a pre-deprivation hearing before being listed. In considering this claim, the Court is guided by the well-settled principle that if the State feasibly can provide a hearing before deprivation of a protected interest, it generally must do so in order to minimize "substantively unfair or mistaken deprivations." *Zinermon v. Burch,* 494 U.S. 113, 132, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Cleveland Bd. of Edu. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ("root requirement" of due process is "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property

interest") (emphasis in original); *Fuentes v. Shevin,* 407 U.S. 67, 80, 81, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) ("If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented").

Here, a hotline call was made to the division alleging that Ms. Jamison and Ms. Dotson had negligently failed to supervise children in their care. In response, an investigator from the division interviewed them and several others about the alleged negligence. At the conclusion of this investigation, the investigator determined that there was probable cause to believe they had committed child neglect, so they were listed in the Central Registry. Ms. Jamison and Ms. Dotson were not given formal notice of the charges prior to being listed and, therefore, had no opportunity to respond to the specific charges made. Even after they were listed, the division was not required to and apparently did not give the women notice of the charges but merely informed them of the division's determination. *See* sec. 210.152.2. Additionally, although Ms. Jamison and Ms. Dotson were allowed to file affidavits explaining their side of what they thought the charges were about, the Act does not provide alleged perpetrators a formal opportunity to present an explanation when the local director reviews the investigator's findings. *Id.*

The investigation alone, even after review by the local director, is plainly insufficient to support the loss of liberty that accompanies listing in the Central Registry. Although Ms. Jamison and Ms. Dotson responded to an investigator's queries, they were not afforded specific notice of the allegation being investigated. Consequently, this did not constitute an opportunity to be heard at a meaningful time or in

a "meaningful manner." *See also Div. of Family Serv. v. Cade,* 939 S.W.2d 546, 554 (Mo.App. W.D.1997) (due process requires pre-deprivation notice that provides "enough information to be able to defend the allegations and to present conflicting evidence in a timely manner"). , "No matter how elaborate, an investigation does not replace a hearing." *Winegar v. Des Moines Indep. Cmty. School Dist.,* 20 F.3d 895, 901 (8th Cir.1994).

The high risk of an erroneous deprivation provides an additional reason that investigation alone is insufficient to support placement on the Central Registry. The evidence adduced below shows that the CANRB reverses the local director's probable cause determination "somewhere in the vicinity" of 35–40% of the time, and this presumably occurs after the local director has reversed additional initial probable cause findings of the investigator. As this rate of reversal makes evident, the "the risk of erroneous deprivation of the private interest through the procedures used," *Mathews,* 424 U.S. at 335, 96 S.Ct. 893 is high indeed, and the probable value providing notice and hearing before being listed is significant.

 Furthermore, under the current procedures there is a considerable post-listing delay before individuals receive a CANRB hearing, at which they are first provided with an opportunity to be heard. "The length and consequent severity of a deprivation are considered in determining what procedural protections are constitutionally required." *Belton,* 708 S.W.2d at

137. Here, although all parties conformed to statutory time frames, more than six months passed between the date Ms. Jamison and Ms. Dotson were informed of the finding of probable cause and the date of their CANRB hearing.[10] *See* sec. 210.152.2; 13 CSR 40–31.025(2), (8)(A). Significantly, the Act sets no time limit on how long the CANRB can take to schedule a hearing or to reach its decision after the hearing. As the parties acknowledge, in the typical case, it takes several months before a CANRB hearing can be scheduled. This months-long process before a party receives notice and an opportunity to be heard counsels strongly for a pre-deprivation hearing. *See Mathews,* 424 U.S. at 341–42, 96 S.Ct. 893 (delay between the deprivation and final decision after a hearing "is an important factor in assessing the impact of official action on the private interests"); *Brock v. Roadway Express, Inc.,* 481 U.S. 252, 270, 107 S.Ct. 1740, 95 L.Ed.2d 239 (1987) (Brennan, J., concurring in part and dissenting in part) (the adequacy of and need for "predeprivation procedures is in significant part a function of the speed with which a post-deprivation or final determination is made").

 Failure to provide a pre-deprivation hearing is acceptable only if (1) a pre-deprivation hearing would be "unduly burdensome in proportion to the liberty interest at stake," (2) the State is unable to anticipate the deprivation, or (3) an emergency requires immediate action. *Zinermon,* 494 U.S. at 132, 110 S.Ct. 975; *Bell v. Burson,* 402 U.S. 535, 542, 91 S.Ct. 1586,

---

**10.** The Act allows as much as six and one-half months to pass before alleged perpetrators reach the CANRB, at which they are provided the first opportunity to respond to the allegation of abuse or neglect. Sec. 210.152; 13 CSR 40–31.025(2), (8)(A). Although this includes the time periods during which an alleged perpetrator *is given an opportunity to* request further review, *see* Sec. 210.152.2; 13 CSR 40–31.025(2)(A) (sixty days to seek review from local director of initial probable cause finding); 13 CSR 40–31.025(8)(A) (thirty days to request review before CANRB after local director review), even assuming alleged perpetrators immediately request available reviews, the Act allows three and a half months to pass before reaching the CANRB.

29 L.Ed.2d 90 (1971). The division does not argue that either of the first two situations apply, and they clearly do not. *See Greene,* 360 U.S. at 492, 79 S.Ct. 1400 (private interest not insignificant or illegitimate); *Zinermon,* 494 U.S. at 136, 110 S.Ct. 975 (when an erroneous deprivation of a protectable interest "will occur, if at all, at a specific, predictable point," it can be sufficiently anticipated so as to require a pre-deprivation hearing).

Nonetheless, and despite the lengthy and often erroneous deprivation of liberty interests prior to an opportunity to be heard, the division argues that this case falls within the narrow category of cases in which a post-deprivation hearing is sufficient to satisfy due process because the urgency of child abuse situations requires the division to take immediate action to protect children. *Bell v. Burson,* 402 U.S. at 542, 91 S.Ct. 1586. Citing the State's strong interest in protecting children from abuse and neglect, *see, e.g., Jane Doe I v. Phillips,* 194 S.W.3d 833, 845 (Mo. banc 2006), the division notes that listing perpetrators of abuse in the Registry provides a means to protect both victims of child abuse and other children with whom a perpetrator of abuse or neglect might come into contact by ensuring that information about cases of abuse is available to individuals and entities responsible for caring for and protecting children. *See* sec. 210.109.2. Thus, the division argues, it should be able to include persons in the Registry based solely on the initial investigation or local director's review.

Although protecting children from abuse and neglect is a significant state interest, it can be fulfilled by means other than depriving individuals of substantial liberty interests without a prior opportunity to be heard. The division has not shown that inclusion in the Registry is required for the division or law enforcement to respond to emergencies by investigating reports of abuse or neglect, removing children from dangerous environments, or pursuing criminal charges against an alleged perpetrator. Rather, the Registry provides information to employers in the child care industry as a complement to the additional and more immediate protective measures permitted by Missouri law. "The need for expediency cannot overshadow the fact that a critical decision [is] being made about" an individual. *New York v. David W.,* 95 N.Y.2d 130, 711 N.Y.S.2d 134, 733 N.E.2d 206, 210–13 (2000) (although streamlined procedures used to determine sex offender registry requirements and dissemination guidelines helped "notify[ ] vulnerable populations of a possible threat," the procedures were unconstitutional because they failed to provide probationers an opportunity to be heard before deprivation of a liberty interest).[11]

Ms. Jamison and Ms. Dotson have a right to pre-deprivation notice and opportunity to be heard. It violated their due process rights to list them in the Central Registry prior to the CANRB hearing, when such procedural protections are first granted.

### 2. The Division Must Prove Allegations by a Preponderance of the Evidence at CANRB Hearing.

---

**11.** *See also Wilderman v. Nelson,* 467 F.2d 1173, 1175 (8th Cir.1972) (suggesting that, although a pre-deprivation hearing is generally not required to protect *property* interests before terminating a public employee, a pre-deprivation hearing would be required if the employee's *liberty* interest were at stake because, "for example, the state " . . . infringes on his liberty by 'imposing on him a stigma or other disability that forecloses his freedom to take advantage of other employment opportunities' "), *citing Bd. of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

■ The next question is what standard of proof the division must meet at the CANRB hearing to satisfy the minimum requirements of due process. At the time Ms. Jamison's and Ms. Dotson's names were placed in the Central Registry, an alleged perpetrator's name was required to be listed once a division investigator found probable cause to believe they had committed child abuse or neglect. Sec. 210.110(2). "Probable cause" exists when the available facts "would cause a reasonable person to believe a child was abused or neglected" when viewed in light of the surrounding circumstances. Sec. 210.110(10).

Similarly, once Ms. Jamison's and Ms. Dotson's appeal reached the CANRB, if it found the allegations of neglect were "supported by evidence of probable cause" and were "not against the weight of the evidence," sec. 210.152.4, the CANRB left their names in the Central Registry, without inquiring whether the alleged abuse or neglect could be proved by a preponderance of the evidence.[12]

A probable cause standard does not require a fact finder to balance conflicting evidence. Thus, it is ill suited to the determination of whether an individual has abused or neglected a child, for abuse frequently involves private conduct for which there is no supporting evidence or objective eyewitness. Questions about whether abuse occurred are, therefore, often resolved by means of subjective determinations of credibility. As the probable cause

standard does not require a balancing of available evidence, it leaves the ultimate assessment "open to the subjective values" of the fact finder, thereby magnifying the risk of erroneous fact finding. *Santosky v. Kramer*, 455 U.S. 745, 762, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).

■ An equally important problem with the probable cause standard is that it "places the brunt of the risk of error, if not the entire risk of error, on" the alleged perpetrator. *Preisendorfer*, 719 A.2d at 594; *cf. Cavarretta*, 214 Ill.Dec. 59, 660 N.E.2d at 258 (requiring use of preponderance standard so that the child protection agency and the subject "share the risk of error, rather than have the accused bear the brunt of the risk"). Due process requires the use of a standard of proof that "reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants." *Santosky*, 455 U.S. at 755, 102 S.Ct. 1388. Since the interests of both parties involved in this case are substantial, it is unacceptable that one party should bear the majority of the risk of error.

For these reasons, a number of other courts have rejected statutes similarly permitting listing of persons in child abuse registries based on application of only a "probable cause" or a "credible evidence" standard at the agency level. For instance, *Valmonte*, 18 F.3d at 1003–04, found that a "credible evidence" standard

12. The phrase "weight of such evidence" is not defined, but the legislature's 2004 amendment to section 210.152.4 makes clear that the phrase does not transform the probable cause test into the equivalent of a preponderance test. The 2004 amendment provides that the CANRB should sustain a division decision to list a person if that decision "was supported by evidence of probable cause prior to August 28, 2004, or is supported by a

preponderance of the evidence after August 28, 2004, and is not against the weight of the evidence." Sec. 210.152.4, RSMo Supp. 2006. "Preponderance of the evidence" is "the degree of evidence that is of greater weight or more convincing than the evidence which is offered in opposition to it or evidence which as a whole shows the fact to be proved to be more probable than not." Sec. 210.110(13), RSMo Supp.2006.

was insufficient to meet due process requirements because it required less than a preponderance of the evidence. Similarly, *Preisendorfer,* 719 A.2d at 593–95, rejected a "probable cause" standard, which required a showing of "information 'that would justify a reasonable person to believe that a child' was abused." [13]

This Court, too finds that the use of the probable cause standard during a CANRB proceeding does not provide constitutionally sufficient safeguards. Due process requires a CANRB to substantiate a report of child abuse or neglect by a preponderance of the evidence before an individual's name can be included in and disseminated from the Central Registry.[14] The Act as amended requires such proof in cases arising after August 28, 2004; it mandates a balancing of all the evidence so that one party does not bear a disproportionate share of the risk of error, *Santosky,* 455 U.S. at 787, 102 S.Ct. 1388 (parties should "share the risk of error in a roughly equal fashion"), thereby negating the concerns presented by the probable cause standard and properly safeguarding the rights of alleged perpetrators. The Act as applied below and as is applicable to all cases arising before August 28, 2004, does not. The provisions of the Act allowing for inclusion of Ms. Jamison's and Ms. Dotson's names in the Central Registry and dissemination of those names based on a probable cause standard and without adequate notice and opportunity to be heard violated the women's liberty interests and are constitutionally invalid.

### 3. Other Procedural Protections Are Not Required at the Pre–Deprivation Hearing.

■ Unlike at the investigation and the first review stages, at the CANRB level, alleged perpetrators are provided notice of the charges and an opportunity to present their side of the case. *See generally* 13 CSR 40–31.025(2)(C) (notice) *and* section 210.153.4; 13 CSR 40–31.025(8)(C), (E), (F) (opportunity to be heard). Specifically, alleged perpetrators "may be represented pro se or be represented by legal counsel" and may appear in person or "submit a written statement . . . in lieu of personal appearance." Sec. 210.153.4(2). The statute further provides that "witnesses providing information on behalf of the child, the alleged perpetrator or the department" may be called. Sec. 210.153

---

**13.** *Accord, Cavarretta,* 214 Ill.Dec. 59, 660 N.E.2d at 258 (rejecting "credible evidence" standard, which was satisfied if "all the available facts, when viewed in light of surrounding circumstances, would cause a reasonable person to believe that a child was abused or neglected"); *Lee T.T.,* 642 N.Y.S.2d 181, 664 N.E.2d at 1251–52 (rejecting "some credible evidence" standard, which was satisfied if there was "evidence worthy of being believed"). In the single instance in which a "credible evidence" standard was upheld, the court did so because the standard was interpreted to require that equal consideration be given all the evidence. *Dupuy,* 397 F.3d at 504–05 (emphasis in original). Because the standard "ought not be assessed in isolation," the court noted that alleged perpetrators are entitled to a pre-deprivation review hearing and a "post-deprivation administrative review (at most within ninety days after a timely request for appeal), at which [the division] must prove its case by a preponderance of the evidence." *Id.* at 507–08. The court found that the "more rigorous" standard combined with the additional protections did not violate due process. *Id.* at 505–07.

**14.** Because it is the *dissemination* of the fact that one's name is included in the Central Registry that is alleged to have violated Ms. Jamison and Ms. Dotson's liberty interests, this Court's opinion does not prohibit the division from retaining information obtained from investigations conducted under the probable cause standard for its own purposes (although this Court notes that investigations since August 28, 2004, have been conducted based on a preponderance standard, *see* sec. 210.110(3), RSMo Supp.2006).

.4(3). Ms. Jamison and Ms. Dotson acknowledge that the CANRB hearing gives them notice and an opportunity to present their side of the case. They allege, however, that this is insufficient and that they are entitled to a full, trial-type adversarial hearing at which they would be entitled to not only notice, a hearing, and proof by a preponderance of the evidence, but also (1) a neutral decision maker, (2) application of rules prohibiting use of hearsay evidence, (3) the right to cross-examine the division's witnesses, and (4) the right to require testimony of witnesses to be under oath.

■■■ Due process requires an impartial decision maker, *see, e.g.*, *Goldberg v. Kelly*, 397 U.S. 254, 271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), but it also presumes the honesty and impartiality of decision makers in the absence of a contrary showing. *Wagner v. Jackson County Bd. of Zoning Adjustment*, 857 S.W.2d 285, 289 (Mo.App. W.D.1993). Since there is no suggestion or showing that a CANRB is incapable of deciding the issue before it fairly, there is no need for a decision maker other than is already provided by the Act.[15]

Similarly, although Ms. Jamison and Ms. Dotson argue that requiring witnesses who testify in a CANRB proceeding to be under oath "is in the interests of both citizens and the state, and is relatively cost-free," they offer no authority suggesting that a failure to do so at an administrative level violates due process. No Missouri case has recognized such a right,[16] and federal cases addressing similar claims have almost universally determined that due process does not require testimony to be taken under oath in an administrative proceeding.[17] This Court concurs.

---

15. Ms. Jamison and Ms. Dotson offer no support for their suggestion that the arbiter be an outsider to the process, in addition to being impartial. This Court nonetheless notes that the CANRB is not made up of division employees but of volunteers appointed by the governor and representing a cross-section of society. *See* sec. 210.153.2, .3. There is no showing that such persons are not neutral and impartial.

16. In at least three Missouri cases, claimants in similar procedural circumstances have alleged that failure to take testimony under oath in the lower proceeding violated due process, but the court did not reach the issue. *See Miller v. Police Retirement System of City of St. Louis*, 296 S.W.2d 78, 79 (Mo.1956); *Ruffin v. City of Clinton*, 849 S.W.2d 108, 111 (Mo.App. W.D.1993); *Lester E. Cox Medical Center v. Labor and Industrial Relations Comm'n*, 606 S.W.2d 427, 431 (Mo.App. S.D. 1980). In at least one case, the court determined that due process did not require testimony under oath in the proceedings at issue. *Knapp v. Junior College District of St. Louis County*, 879 S.W.2d 588, 592–93 (Mo.App. E.D.1994) *overruled on other grounds by State ex rel Yarber v. McHenry*, 915 S.W.2d 325, 330 (Mo. banc 1995).

17. *See, e.g., Bowens v. N.C. Dept. of Human Resources*, 710 F.2d 1015, 1020 (4th Cir.1983) (hearing before state medical agency regarding suspension from Medicaid program); *Alverez v. Turner*, 422 F.2d 214, 219 (10th Cir. 1970) (parole revocation proceeding); *Ahern v. Keene*, 593 F.Supp. 902, 911 (D.Del.1984) (state administrative hearing conducted in accordance with Education for All Handicapped Children Act, 20 U.S.C. sec. 1401–1461 (1982)); *Ford v. Jones*, 372 F.Supp. 1187, 1189–90 (E.D.Ky.1974) (hearing before county board of education regarding non-renewal of teacher's license); *Sinclair Oil Corp. v. Smith*, 293 F.Supp. 1111, 1115 (S.D.N.Y. 1968) (hearings before federal administrative agencies). *But see, Nimmo v. Simpson*, 370 F.Supp. 103, 106 (E.D.Va.1974); *Potemra v. Ping*, 462 F.Supp. 328, 335, (S.D.Ohio 1978) (both suggesting that due process might require testimony to be under oath in some circumstances). The only circumstances in which a federal court has conclusively determined that due process required testimony to be taken under oath is in the context of hearing for the renewal or revocation of liquor licenses. *See Trumbull Div., Owens–Corning Fiberglass Corp. v. Minneapolis*, 445 F.Supp. 911, 917 (D.Minn.1978); *Manos v. Green Bay*, 372 F.Supp. 40, 51 (E.D.Wis.1974).

As to the other claimed procedural protections demanded, their provision would, in effect, turn the CANRB hearing into a full-blown evidentiary hearing with most of the indicia of a trial court hearing. The legislature can provide for such protections at the administrative level, as it has done in contested case proceedings under the Missouri Administrative Procedure Act ("MAPA"), *see generally Hagely v. Bd. of Educ. of the Webster Groves School Dist.*, 841 S.W.2d 663, 668 (Mo. banc 1992) *overruled on other grounds by Weber v. Firemen's Retirement Sys.*, 872 S.W.2d 477, 480 n. 3 (Mo. banc 1994). Here, the legislature has chosen instead to provide more limited administrative procedural protections, but then to provide, upon request of the alleged perpetrator, a *de novo* review more extensive than that provided for MAPA contested case review. *Compare* sec. 210.152.5 *with* sec. 536.140.

In this circumstance, the procedure provided at the administrative level is sufficient to satisfy minimum due process standards. Courts have recognized a right to a full evidentiary hearing of the type sought by Ms. Jamison and Ms. Dotson only in situations in which the deprivation results in the denial of the basic necessities of life. *See Goldberg*, 397 U.S. at 264, 90 S.Ct. 1011. In other cases, the courts have held that protections akin to those provided before the CANRB, which include notice and the opportunity to be heard, are sufficient to satisfy due process.

In *Loudermill*, for example, the Supreme Court considered the process due to state public employees prior to termination. Specifically noting that its holding rested in part on the statutory provision for a "full post-termination hearing," the Court found that due process was satisfied by an employee's receipt of "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story" before deprivation of his interest. 470 U.S. at 546, 105 S.Ct. 1487.[18]

Similarly, this Court determined that due process did not require "extensive, formal hearings" before suspension of a police officer. *Belton*, 708 S.W.2d at 138. *Belton* noted that when pre-deprivation procedures are coupled with adequate post-deprivation remedies, they are sufficient if they provide " 'an initial check against mistaken decisions.' " *Id.*, citing *Loudermill*, 470 U.S. at 545, 105 S.Ct. 1487. It held that providing the officer with "notice of the charges and the evidence against her and an opportunity to present her side of the story" before suspension satisfied due process requirements. *Id.*

---

**18.** *See also Brock v. Roadway Express, Inc.*, 481 U.S. 252, 264–267, 107 S.Ct. 1740, 95 L.Ed.2d 239 (1987) (due process is satisfied when an employer subject to retaliatory discharge allegations received notice of the charges, "notice of the substance of the relevant supporting evidence, an opportunity to submit a written response, and an opportunity to meet with the investigator and present statements from rebuttal witnesses" before the employer was required to reinstate the employee; employer was not entitled to confront and cross-examine the witnesses supporting the employee's allegation); *Goss v. Lopez*, 419 U.S. 565, 581, 583, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (in the context of student disciplinary proceedings, oral or written notice of the charges, an explanation of the evidence, and an opportunity for the student to present his side of the story is all that is required prior to discipline; due process does not require counsel, confrontation and cross-examination of witnesses supporting the charge, or the student's ability to call his own witnesses); *Arnett v. Kennedy*, 416 U.S. 134, 156–57, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (upholding procedures whereby, prior to discharge, a government employee is provided advanced written notice of reasons for proposed discharge, material on which notice is based, and the right to respond to charges orally and in writing).

*Dupuy,* a case in which an alleged perpetrator of child abuse challenged the procedures attendant to Illinois' child abuse registry, used similar reasoning. Analogizing the alleged perpetrator's interest to that of a terminated public employee, *Dupuy* first noted that, in most situations, the "pre-termination process need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story." 397 F.3d at 504. Balancing the interests involved, the court determined that, given the state's interest in "identify[ing] individuals who pose a continuing threat to children" and the opportunity for prompt post-deprivation judicial review, due process did not require the provision of additional procedural protections. *Id.* at 508–09.

The reasoning in these cases is applicable here. While, Ms. Jamison's and Ms. Dotson's right to pursue professions of their choosing is significant, *Greene,* 360 U.S. at 492, 79 S.Ct. 1400; *Loudermill,* 470 U.S. at 543, 105 S.Ct. 1487, neither woman is entirely deprived of a means of livelihood as a result of the inclusion of their names in the Central Registry. Although they may be forced to work in a field with which they have no experience and for which they have no special training or skills, and although finding such work "will take some time and is likely to be burdened by the questionable circumstances under which [they] left [their] previous job," *Id.,* they can still earn a living. *Compare Goldberg,* 397 U.S. at 264, 267–68, 90 S.Ct. 1011 (discontinuance of welfare benefits entitled person to full evidentiary hearing because they provide "the very means by which to live"); *see also Mathews,* 424 U.S. at 340–41, 96 S.Ct. 893 (comparing welfare recipient's interest with plaintiff's interest in disability benefits, which are not based on financial need and

could be supplemented by other sources and, so, entitled plaintiff to "something less than an evidentiary hearing").

In light of the State's interest in protecting children and the fact that the Act provides Ms. Jamison and Ms. Dotson with the right to seek *de novo* judicial review, the protections given at the CANRB hearing are sufficient.

**D. De Novo** *Judicial Review Under a Preponderance of the Evidence Standard.*

■ By statute, an alleged perpetrator aggrieved by the CANRB's decision is entitled to "de novo judicial review in the circuit court." Sec. 210.152.5. Ms. Jamison and Ms. Dotson argue, however, that this post-deprivation review is inadequate in two respects. First, they argue that, as to cases arising before August 28, 2004, prior case law has interpreted the Act to require the circuit court to determine only whether the division had probable cause to believe abuse or neglect occurred and not to require proof by a preponderance of the evidence. *See Williams v. State,* 978 S.W.2d 491, 494 (Mo.App. S.D.1998). *Williams* correctly held that, because section 210.152.5 specifically provides for *de novo* judicial review, a trial court must base its decision on the evidence presented in the trial court and not merely review the record before the CANRB. *See also Lipic v. State,* 93 S.W.3d 839, 842 (Mo. App. E.D.2002); *Petet v. State,* 32 S.W.3d 818, 821 (Mo.App. W.D.2000). Without further explanation, however, *Williams* also concluded that in so doing the ultimate issue was whether there was probable cause to believe the alleged perpetrator committed the abuse or neglect. 978 S.W.2d at 494.

As the division notes in its brief, "there is nothing in the statute to support" *Williams'* application of a probable cause

standard of proof upon review of a CANRB decision. In fact, were *Williams'* interpretation correct, an alleged perpetrator's name could be listed in the Central Registry indefinitely without any decision maker ever finding that the allegations were proved by a preponderance of the evidence, which is the minimum standard of proof in civil cases. *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 110 (Mo. banc 1996), *citing Santosky*, 455 U.S. at 755, 102 S.Ct. 1388; *see also* MAI 3.01. Clearly, even had this Court not found that a preponderance of the evidence test was required at the administrative level, it would be required on *de novo* judicial review. A circuit court must independently determine whether a preponderance of the evidence shows that the alleged abuse or neglect occurred. To the extent that *Williams* and other cases hold otherwise, they are overruled.

Ms. Jamison's and Ms. Dotson's second claim relating to the *de novo* review focuses on the statutory provision that the "alleged perpetrator may subpoena any witnesses except the alleged victim or the reporter" at the review hearing. Sec. 210.152.5. They argue that this is unfair because it will prevent them from confronting and cross-examining the witnesses against them. But they also recognize that public policy considerations, including protecting child victims from further harm and protecting the anonymity of reporters,[19] make it appropriate in some circumstances to limit the power of an alleged perpetrator to compel the testimony of a victim or reporter. They suggest that the trial court struck a proper balance by fashioning an "evenhanded" rule that if one party cannot subpoena the reporter or victim, neither can the other.

This Court rejects Ms. Jamison's and Ms. Dotson's premise that only a dual inability to subpoena the victim or reporter can protect their right to cross-examination. The argument can only be based on the presumption that the division will be permitted to introduce affidavits or prior statements or testimony of the victim and reporter if the division chooses not to call the victim or reporter. Such is not the case.

As this Court noted earlier, approval of the less formal hearing procedure provided before the CANRB is premised on the availability of a "full post-termination hearing" in the circuit court, *Loudermill*, 470 U.S. at 546, 105 S.Ct. 1487. At the post-termination hearing, the alleged perpetrator must be provided a fair opportunity to present a defense. *See Weiss v. United States*, 510 U.S. 163, 178, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994) ("a fair trial . . . is a basic requirement of due process"); *State v. Baumruk*, 85 S.W.3d 644, 650 (Mo. banc 2002) ("Failure to give the accused a fair hearing violates the minimal standards of due process").

Thus, during *de novo* review in the circuit court, a victim or reporter who testifies voluntarily or under subpoena from the division would be subject to cross-

---

**19.** Child victims of abuse and neglect might be further traumatized by the experience of facing their abuser and being subject to cross examination. *Cf. State v. Uelentrup*, 910 S.W.2d 718, 722 (Mo.App. E.D.1995) (recognizing the purpose of Missouri's Child Victim Witness Protection Law, sec. 491.675 et seq., as an attempt to "minimize the emotional and psychological trauma to the alleged child victim"). Additionally, people who might otherwise report child abuse or neglect may not do so if anonymity is denied, as could occur if reporters could be subpoenaed. *Cf. State v. Rollie*, 962 S.W.2d 412, 415 (Mo.App. W.D. 1998) (explaining that the purpose of withholding the identity of confidential informants is "to protect and further public interest in law enforcement by encouraging citizens" to report crimes).

examination, just like any witness testifying in circuit court.[20] Conversely, and as also is the case with any witness, if a victim or reporter does not testify, any prior statements or affidavits would be inadmissible unless a recognized hearsay exception applied. In this regard, the de novo review is like other hearings held in the circuit court. Thus, Ms. Jamison and Ms. Dotson's concern that the division will attempt to meet its burden of proof by relying on evidence not subject to cross-examination is not well-founded.

## IV. CONCLUSION

This Court holds that individuals subject to having their names included in the Central Registry have a constitutionally protected liberty interest because the dissemination of their names from the Central Registry creates a stigma damaging to their reputation and effectively precludes their employability in the profession of their choosing. Thus, before such individuals can be included in the Central Registry they are entitled to notice and a pre-deprivation hearing before the CANRB, at which a preponderance of the evidence standard will apply. To the extent that sections 210.110 and 210.152 permit listing prior to a CANRB finding of abuse or neglect by a preponderance of the evidence, they violate due process and are invalid. This Court further finds that, upon *de novo* judicial review of a CANRB decision, due process requires application of a preponderance of the evidence standard of proof. As interpreted, the remainder of the Act is constitutional. Accordingly, this Court affirms the judgment in

part, reverses it in part, and remands the case.

All concur.

---

20. *See Goldberg*, 397 U.S. at 269, 90 S.Ct. 1011 ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses"); *Greene*, 360 U.S. at 496, 79 S.Ct. 1400 ("evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue ... [via] confrontation and cross-examination").