305 S.W.3d 469 (2010)
T.J., Appellant,
v.
MISSOURI DEPARTMENT OF SOCIAL SERVICES, CHILDREN'S DIVISION, Respondent.
No. ED 93105.
Missouri Court of Appeals, Eastern District, Division Four.
February 23, 2010.
*470 T.J., St. Charles, MO, pro se.
Chris Koster, Attorney General, Gary L. Gardner, Assistant Attorney General, Jefferson City, MO, for Respondent.
KURT S. ODENWALD, Presiding Judge.

Introduction
This case involves a single mother who left her six-year-old daughter home overnight in St. Charles County, without any supervision, while she spent the night away from her home somewhere in the City of St. Louis. T.J. (Mother) appeals from the Order and Judgment of the Family Court Division of the Circuit Court of St. Charles County upholding the ruling of the Child Abuse and Neglect Review Board (the Board), and finding by a preponderance of the evidence that Mother neglected her six-year-old daughter, G.J. (Daughter), under these circumstances. Finding no error in the judgment, we affirm.

Background
On the morning of July 20, 2007, at approximately 7:30 a.m., the St. Peters Police Department received a call from an alarm company indicating a residential alarm was going off at both the garage and front door of a home in St. Peters. Officers Cheryne Flint (Flint) and Todd Lewis (Lewis) were dispatched to the home. Upon arriving, Flint went to the front door, which she found neither latched or *471 locked. Flint was able to push open the door without turning the doorknob. As Lewis walked to the front of the house and the two officers prepared to enter the home, a neighbor from across the street approached the officers and stated that she turned the alarm off. The neighbor explained that the homeowner, Mother, called her with the alarm code and asked her to watch Daughter for a few minutes. The neighbor told the officers that when she went to the home to turn off the alarm, Daughter met her at the front door. Daughter told the neighbor that she did not know where her mother was and that she was scared. The neighbor then took Daughter to her home. Flint believed the alarm sounded when Daughter entered the garage to look for her mother's car, and again went off at the front door when the neighbor entered the house to turn off the alarm.
Flint spoke with Daughter, who said she did not know where her mother was. Daughter told Flint that it was her second day of first grade. Daughter did not know her mother's cell phone number and told the officers that she had been left home alone on one or two prior occasions.
At around 8:15 a.m., Mother arrived home. The officers then asked the neighbor to watch Daughter while they talked with Mother inside the house. Flint wrote in the police report that:
[Mother] approached me and said she was sorry about the alarm and said she appreciated the police coming to check on her house. [Mother] appeared to be dressed in her pajamas and her hair was disarrayed. I asked where [Mother] had been and [Mother] said she had gone to the store. I asked which store. [Mother] did not answer. I said did you go to Shop and Save right over here on Jungerman? [Mother] said `no, I was a little farther away than that.' I asked again `where were you?' [Mother] said that she was not at the store but at a friend's house. I asked what friend. [Mother] said just a friend. I asked for the name of the friend. [Mother] would not answer. I asked [Mother] how long she had been gone. [Mother] said not long. I asked again what the name and phone number of the friend was. [Mother] started to cry and said please just give me a warning. I asked if the friend was male or female. [Mother] said female. I asked where her friend lived and [Mother] stated 270 and Dorsett. I asked [Mother] how long she was really gone. [Mother] said she left about midnight. I asked if [Daughter] was left at home by herself while [Mother] was at her friends. [Mother] said yes but she was only planning on being gone a couple of hours while [Daughter] was sleeping but she fell asleep at her friends house.
Flint continued to interview Mother, who eventually admitted that she was at a male friend's house. The officers contacted Mother's male friend who said that Mother came to his house sometime between 11 p.m. and midnight.
Flint then contacted the Child Abuse Hotline. The police report also indicates that Flint "contacted Juvenile" and it was decided to leave Daughter in Mother's custody because there was no history with the police department or DFS. Flint then retrieved Daughter from the neighbor's house and got her ready for school. Lewis then transported Daughter to her elementary school.
Jessica Patsaros (Patsaros), a hotline investigator with the Children's Division of the Department of Social Services (Children's Division), then arrived at the home. Patsaros and the officers spoke with Mother in her home. Flint noted that the "house was very messy and there were dishes piled up in the sink, counters and *472 the stove. There were toys, mail and clothing on the floors and hallway." Patsaros interviewed Mother who admitted "that it was bad judgment on her part and that it would never happen again." Mother also admitted that her male friend lived close to Interstate 70 and Union in the City of St. Louis. Mother "said that she did not mean to fall asleep at her friend's house and that she had planned on only being gone for a couple of hours." Patsaros concluded her interview and made an appointment with Mother for the next week. Patsaros advised Mother to clean up the house in the meantime. Patsaros returned to Mother's home on July 26 and noted the house to be very clean, put together, and that the dishes were done.
After concluding her discussion with Mother on the morning of the incident, Patsaros went to Daughter's school and spoke with Daughter in the presence of a school counselor. Daughter told Patsaros that her mother had gone to the store before while she was sleeping.
On July 30, 2007, after completing its investigation pursuant to Sections 210.110-210.165, RSMo.2000[1], the Children's Division determined that the report of neglect was substantiated, and found by a preponderance of the evidence that Mother neglected Daughter by leaving her alone overnight without supervision.
At Mother's request, on April 22, 2008, the Board[2] met to review the child abuse and neglect investigation. After reviewing the information, the Board upheld the Preponderance of the Evidence finding of the Children's Division and placed Mother's name on the Central Registry.[3]
Mother filed an application for de novo review of the Board's decision with the Circuit Court of St. Charles County. A hearing on Mother's application was held on April 28, 2009. At the conclusion of the hearing, the court noted:
[T]he fact remains that there was a child, six years old, who was left at a house unsupervised, unattended for a significant period of time, during which a number of dangerous things could have happened.
Now, you know, God intervened and protected this child from anything weird happening, like a fire or the child waking up and walking out the door and a sex offender walking by at the same time. I mean, any number of weird things could have taken place here. Freak things maybe in the mind of some, but they certainly can take place. And if a child that age is left alone, that's the kind of things you hear about tragically on news reports of things thatterrible that happen when children are by themselves and have no one to protect them.
. . .
But, unfortunately, I don't believe youit's ever been your position that you didn't knowingly leave the child alone and that perhaps you assumed that you'd be back in a short amount of time, or that eventually you'd get there and you'dthe child would still be *473 asleep or something. But I don't think you've ever really disputed that.
The circuit court found that, based on the evidence presented, by the preponderance of the evidence, Mother neglected her daughter by leaving the six-year-old home alone from 11:30 p.m. until 8:15 a.m. without proper supervision. The circuit court upheld the findings of the Board.
Mother filed a timely Notice of Appeal. This appeal follows.

Points on Appeal
Mother's brief presents two sections which Mother terms "Points Relied On." However, it is difficult to ascertain exactly what Mother is appealing in each of her "points."
In her first point, Mother "requests a review of the term `proper supervision' as it is stated in the conclusion of law." Mother claims that the ruling does not give any weight to parental discretion. Mother asserts "the court erred in upholding the [Board's] decision and finding of neglect in April 2008 because the decision is against the weight of the evidence in that it does not specifically preclude electronic monitoring nor does it give any weight at all to Parental Discretion and Authority as it relates to the care and custody of the child." Instead, Mother contends her daughter "was monitored electronically at all times and the record corroborates these facts."
In her second point, Mother alleges the court "abused its discretion in this de novo judicial review, by openly and without any equity giving all preferential deference to the Children's Division."
Mother's enumerated points on appeal provide this Court with little guidance in our review of her case. However, after reading Mother's entire brief, we glean that Mother is essentially claiming that the circuit court's decision was against the weight of the evidence because the facts presented do not support the finding of neglect. Instead, Mother argues her daughter was properly supervised by "electronic" means and that, as the child's mother, the proper mode of supervision is within Mother's discretion.

Standard of Review
"The trial de novo in the circuit court, although in theory an appeal of the administrative hearing, is an original proceeding and is not an exercise of review jurisdiction." Vaughn v. Mo. Dep't of Soc. Serv., Div. of Family Serv., 161 S.W.3d 883, 885 (Mo.App. E.D.2005). Thus, this Court reviews the decision of the circuit court rather than the decision of the Board. Id. "We will uphold the circuit court's decision unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declare[s] or applies the law." Id.

Discussion
Mother appeals as a pro se litigant, and while it appears she at least attempts to conform to the rules of this Court, her brief is sorely lacking in both form and content. In addition to submitting conclusory arguments devoid of legal merit or substantiated, relevant facts, this Court is justified in dismissing Mother's appeal for numerous procedural defects including an insufficient jurisdictional statement, Rule 84.04(b), an insufficient statement of facts, Rule 84.04(c), a deficient statement of the points relied on, Rule 84.04(d)(1), and an argument that fails to set forth the applicable standard of review, Rule 84.04(e). See Rodriguez v. Osco Drug, 166 S.W.3d 138, 140 (Mo.App. W.D.2005). However, as a pro se litigant, we will consider her appeal on the merit s, ex gratia, to ensure that there will be no manifest injustice from such a dismissal. See id.
*474 Because we cannot wholly gather what Mother intends to argue in her "Points Relied On," we instead address her overarching allegation on appeal. Mother argues that the ruling of the circuit court is against the weight of the evidence because Daughter was not "unsupervised." Mother contends that she provided for "electronic" means of supervision and the manner of supervision is within Mother's discretion as Daughter's parent. We disagree with Mother's position and find no error in the circuit court's judgment.
"Neglect" is defined by Section 210.110(12) as "failure to provide, by those responsible for the care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well-being." Given the facts contained in the record before us, the finding of neglect made by the circuit court is not against the weight of the evidence.
The largely undisputed evidence unequivocally supports the circuit court's finding of neglect. Mother does not dispute that she is Daughter's mother and is "responsible for the care, custody, and control of the child." Mother claims she did not "fail to provide ... the proper or necessary support ... or any other care necessary for the child's well-being." However, Mother admitted that she left the six-year-old child alone overnight, admitted the child was not supervised by another person,[4] and admitted she was gone from the home for more than a few hours. The evidence also indicates that this incident was not the first time Mother left Daughter home alone, that Daughter did not know where her mother was or know her mother's cell phone number, and that Daughter was scared. Given Daughter's age, the length of time Mother was absent from the home, and the lack of supervision provided for Daughter, we cannot find the circuit court's finding of neglect was against the weight of the evidence. This evidence is sufficient to support a finding of neglect based on lack of supervision.
We are careful to note that the evidence does not suggest Mother willfully endangered her child or intended any harm to come to her child. We do, however, find that sufficient evidence existed for the circuit court to find that, under the definition of Section 210.110, Mother did "neglect" her daughter by leaving her, unsupervised, alone in her home for an extended amount of time.
In addition to arguing the lack of evidence to support a finding of neglect, Mother also argues her actions do not rise to the level of "neglect" for several reasons. First, Mother "requests a review of the term `proper supervision' as it is stated in the conclusion of law," and argues that her actions did not amount to "neglect" because "the child was monitored electronically at all times."
Mother asserts that her electronic home security monitoring system somehow qualified as sufficient supervision for her six-year-old child. Mother argues that as her child "slept she was being monitored electronically by the alarm company which is made up of a staff of adults." Furthermore, "[Mother] trusted electronic monitoring for her livelihood at the time and still believes that electronic means that have been proven are safe." Mother argues:
[T]he child was monitored electronically at all times and the record corroborates these facts, her safety was guaranteed and documented:

*475 1. Home security alarm installed and believed to be in working order
2. Home phone and cellular phone service
3. Adequate food and shelter
4. Neighbors in close proximity and one who verbally agreed to watch the child and in fact performed this duty when requested
Mother further argues the presence of fire alarms on each floor, noting that they are tested a minimum of two times per year, as evidence the child was "supervised." In closing, Mother, "asks the Court to use equity to determine if electronic supervision, telephone access, human backup meet the thresholds for supervision as required by law."
We live in an age of technological innovation and wonder. The presence of electronic alarms and devices which monitor entry into the home and the presence of smoke and fire provide an increased protection against harm that might have occurred to Daughter in Mother's extended absence. However, we are not ready to declare, nor have we found any judicial authority that validates the delegation of parental supervision to electronic devices. The "electronic" supervision upon which Mother apparently relied on to "supervise" her six-year-old child is insufficient to constitute "care necessary for the child's well-being," as required by Missouri law. Providing a home security system is not adequate supervision for a six-year-old child. Daughter's good fortune in having nothing serious happen to her during Mother's absence does not confirm the adequacy of Mother's "electronic" supervision. Had the fire alarm sounded, would the unsupervised six-year-old child have known what precautions to take? Having no knowledge that her mother was not home, would Daughter possibly have perished in a house fire while searching for her mother? Had Daughter become injured or seriously ill and was unable to use a phone, could the house alarm have called an ambulance? The possible harms that could have befallen Daughter are uncertain. However, the law provides a level of certainty and protection for Daughter in that the state need not wait until an unfortunate incident occurs to find a parent poses a risk of harm to his or her child. See In re L.D.R., 169 S.W.3d 137, 142 (Mo.App. E.D.2005); see also In re Adoption of B.D.W., 185 S.W.3d 727, 739 (Mo.App. S.D.2006) (finding the child was neglected when the mother failed to protect the child from an inappropriate caregiver by maintaining a relationship with him even though it was a clear risk to herself and the child). Leaving a six-year-old child home alone overnight with a home security system does not constitute adequate supervision. The circuit court's finding, by a preponderance of the evidence, that Mother neglected her child is supported by the weight of the evidence.[5]
In addition to arguing that her daughter was properly supervised by "electronic" means, Mother also argues that it was within her discretion, as Daughter's parent, to determine what supervision was necessary for the child's safety and well-being. Mother argues the circuit court's finding of neglect is against the weight of the evidence because it does not give weight to "Parental Discretion and Authority as it relates to the care and custody of the child." Mother asserts that "[t]o my understanding, parents have the right and the ultimate responsibility for caring for their children; each family is different *476 and unique based on their cultural beliefs and background."
While Mother is correct in arguing that many decisions with regard to raising children are within the realm of parental discretion, her argument fails to recognize the parameters within which parents are obligated by law to raise their children. See Hartman by Hartman v. Hartman, 821 S.W.2d 852, 856 (Mo. banc 1991) (noting "that parents must be able to exercise a great degree of discretion in control over the relationship with their child," however "[p]arents should not be permitted to exercise parental prerogatives completely without concern for liability."); see also M.A. v. J.A., 781 S.W.2d 94, 96 (Mo.App. E.D. 1989) ("Neglect is to be determined in light of societal norms."). Missouri law prohibits parents from abusing, neglecting, or abandoning their children, despite a parent's belief that it is their right "to parent their child" as they see fit. Sections 210.109-210.183. Mother notes that while some may not agree with her choices, she asks "that the parties at least respect [her way] as another way." Even allowing for the discretion the law provides to parents in child-rearing decisions, we cannot find error in the circuit court's finding of neglect under Missouri statutes when a six-year-old child is left alone in a house for an extended period of time, without proper supervision, without information on how to contact the parent, or even with knowledge that the parent has left the home.[6]
After a review of the evidence, we find that the circuit court's conclusion, finding that, by a preponderance of the evidence, Mother neglected her daughter, is supported by the weight of the evidence. Mother's point is denied.

Conclusion
We affirm the judgment of the circuit court.
GEORGE W. DRAPER III and GARY M. GAERTNER, JR., JJ., Concur.
NOTES
[1] All further statutory references are to RSMo 2000, unless otherwise indicated.
[2] The Child Abuse and Neglect Review Board "consists of nine members, who are appointed by the governor with the advice and consent of the senate." Jamison v. Dep't of Soc. Serv., Div. of Family Serv., 218 S.W.3d 399, n. 4 (Mo. banc 2007).
[3] "The Central Registry is a statewide child abuse and neglect registry maintained by the division as part of Missouri's efforts `to promote the safety of children ... [by] providing services in response to reports of child abuse or neglect.'" Jamison, 218 S.W.3d at 402-03.
[4] Mother argues the child was supervised "electronically."
[5] While we recognize and understand the additional strains placed upon Mother as a single parent, we cannot ignore the needs of the child in that relationship. Showing "leniency" to Mother because of our understanding of her situation would undermine the protections afforded children under Section 210.110.
[6] When Mother left home, Daughter was asleep and unaware of Mother's absence from the house. Daughter had no knowledge of Mother's whereabouts. Daughter had no means of initiating contact with Mother because Daughter did not know Mother's cell phone number. Mother suggests there was "human back up," but did not alert any of her neighbors that Daughter was home alone, or ask any neighbor to look after Daughter until the alarm sounded. Mother's initial refusal to admit how long she had been absent from the home or where she had been suggests that Mother acknowledged her significant lapse in judgment, even if only temporary.