# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| J.P., | : | **SEALED CASE** |
| Petitioner | : | |
| | : | |
| v. | : | No. 1602 C.D. 2016 |
| | : | Submitted: May 26, 2017 |
| Department of Human Services, | : | |
| Respondent | : | |

BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
HONORABLE JULIA K. HEARTHWAY, Judge[1]
HONORABLE BONNIE BRIGANCE LEADBETTER,  Senior Judge


OPINION BY JUDGE BROBSON                    FILED:  September 12, 2017


J.P. (Petitioner) petitions for review of an adjudication of the Department of Human Services (Department), Bureau of Hearings and Appeals (Bureau), which dismissed his appeal of an indicated report of student abuse under the Child Protective Services Law[2] as untimely.  In doing so, the Bureau adopted the recommendation of its administrative law judge, who concluded that Petitioner's appeal was untimely and that the delay in filing his appeal was not caused by a breakdown in the administrative process or non-negligent reasons beyond Petitioner's control.  For the reasons that follow, we reverse and remand.

---

[1] This decision was reached before Judge Hearthway's service with the Court ended on September 1, 2017.

[2] 23 Pa. C.S. §§ 6301-6386.

# I. Background

On June 2, 2000, the Philadelphia Department of Human Services (Philadelphia DHS) submitted a report of student abuse to the ChildLine and Abuse Registry, naming Petitioner as the perpetrator. On June 12, 2000, the Department of Public Welfare (now the Department of Human Services)[3] sent a letter to Petitioner, informing him that he was named on an indicated report of student abuse. The June 12, 2000 letter provided, in pertinent part:

> Only perpetrators of child abuse or school employees named in reports for student abuse may request that indicated reports be amended or destroyed if they believe the report is inaccurate or that it is not being maintained in accordance with the law. ALL REQUESTS MUST BE MADE IN WRITING WITHIN 45 DAYS FROM THE DATE OF THIS NOTICE to the Secretary of Public Welfare []. If this request is denied, perpetrators may have a right to a hearing.

(Reproduced Record (R.R.) at 13a (emphasis in original).)

On July 25, 2000, Petitioner sent a letter in response, received by the Department on July 27, 2000, in which he requested that the indicated report be "destroyed or amended . . . ." based on "errors in this report." (R.R. at 14a.) He explained: "If necessary, I would like to appeal or dismiss this claim. If a hearing is necessary, I would like one." (*Id.*)

Thereafter, on August 8, 2000, the Department sent a second letter to Petitioner, informing him that the Department received the request. Further, the August 8, 2000 letter described the following two-step appeal process. First, the

---

[3] Because the Department of Public Welfare became the Department of Human Services and the name change has no bearing on the outcome of this case, for simplicity, we will refer to both as the Department.

Department will conduct a review of Petitioner's case and issue a written decision. Second, either party—Petitioner or the Department—could appeal an unfavorable decision, which would result in a hearing before the Bureau. Moreover, the August 8, 2000 letter informed Petitioner that he could "bypass the first level of the appeal process" by sending "a written request for the hearing[,] . . . postmarked within ten days" of the August 8, 2000 letter. (R.R. at 16a (emphasis omitted).)

Finally, the Department sent Petitioner a third letter, dated February 22, 2001. This letter informed Petitioner that the Department had completed its review and provided the following:

> We believe the report is accurate and being maintained in a manner consistent with the Child Protective Services Law.
>
> . . . .
>
> If it is your desire to have a hearing, please submit your request in writing within 45 days of the date of this letter to [the Director of the Division of State Services] at the above address. [The Director of the Division of State Services] will forward your request to the Bureau of Hearings and Appeals who will schedule a hearing and notify you of the time and place.

(R.R. at 17a (emphasis omitted).) Petitioner did not respond to the August 8, 2000 letter or the February 22, 2001 letter. Although the police interviewed Petitioner regarding the underlying incident, the police never arrested or charged him with any crime. Approximately fifteen years passed, and Petitioner continued to work as a teacher.

In 2016, Petitioner's school district employer required him to renew his background check. As a result of that submission, the school district discovered that Petitioner is listed on the ChildLine Registry. On June 1, 2016, Petitioner's school district sent a letter to Petitioner, informing petitioner that his

3

background check "raised an issue," adding: "This issue may effect [sic] your continued employment with The District." (R.R. at 34a.) The letter also informed Petitioner that the school district scheduled a hearing on the matter. At the hearing, in response to Petitioner's contention that the underlying incident was a misunderstanding, the school district instructed Petitioner to resolve the matter before the end of the school year.

As a result of his school district's directive, Petitioner requested that the Department provide a copy of the indicated report. Thereafter, on June 14, 2016, Petitioner's former counsel requested a hearing before the Bureau on the indicated report.

On August 9, 2016, an administrative law judge from the Bureau conducted an evidentiary hearing on the timeliness of Petitioner's appeal of the indicated report. Regarding the incident that led to his placement on the ChildLine Registry, Petitioner testified that he was interviewed by the police, but he was never arrested or charged with any crime. Petitioner testified that following the underlying incident, he received the June 12, 2000 letter from the Department. He testified that he responded in writing that he wanted a hearing if one was necessary. Petitioner testified that he did not receive the August 8, 2000 letter from the Department. He testified that had he received the August 8, 2000 letter, "[he] would [have] file[d] the same papers, requesting a hearing." (R.R. at 98a.) Petitioner testified that he also did not receive the February 22, 2001 letter. Petitioner explained that he moved in October 2000, from southwest Philadelphia

4

to northeast Philadelphia.[4] He testified that he believed he filed a change of address with the Commonwealth and that he did file a forwarding address with the postal service. He testified that he did not keep the copies of the form to change his address with the postal service, because he did not know that his change in residence would be a topic of dispute. Petitioner testified that he did not hear anything about the placement on the ChildLine Registry until his school district notified him in 2016. As to why he took no action regarding the matter between his July 25, 2000 response and 2016, he responded that he "thought everything was fine, and [his] appeal was successful." (R.R. at 103a-104a.) Petitioner additionally testified that he thought "if it was a problem, [he] would've been fired from [his] job." (R.R. at 108a.)

The Department called ChildLine Appeal Unit administrative assistant Tiffinee McClendon-Spencer (McClendon-Spencer) to testify. She testified that she began working for ChildLine in 1999, and she began her current position as an administrative assistant in 2002. McClendon-Spencer testified that her position with ChildLine entails "keeping track of all appeal records." (R.R. at 118a.) McClendon-Spencer testified that there was nothing in Petitioner's file that indicated that either the August 8, 2000 letter or the February 22, 2001 letter was returned as "undeliverable." In response to a line of questioning by the administrative law judge as to ChildLine's typical policy or procedure when receiving a vague request or response, using Petitioner's July 25, 2000 response as an example, McClendon-Spencer answered: "We would actually go ahead and

---

[4] Petitioner testified to the addresses, rather than the general areas within Philadelphia. Those addresses were redacted from the transcript.

review it here. *And if it was denied, we would push it on for a hearing.*" (R.R. at 128a (emphasis added).)

The administrative law judge rendered a decision, recommending dismissal of Petitioner's appeal. The administrative law judge determined that the February 22, 2001 letter required Petitioner to send an appeal by April 9, 2001. Thus, by requesting a hearing on June 14, 2016, Petitioner's appeal was untimely. The administrative law judge next addressed the language of Petitioner's July 25, 2000 letter (received July 27, 2000) to the Department, as follows:

> Additionally, [Petitioner]'s July 25, 2000 appeal does not explicitly state that he is requesting a hearing at that time, but rather, [Petitioner] is only requesting a hearing if it is necessary. Since it is not necessary to have a hearing to amend or destroy an indicated report of child abuse, I do not find [Petitioner]'s July 25, 2000 appeal to be a timely request for a hearing.

(R.R. at 42a-43a.) The administrative law judge also credited McClendon-Spencer's testimony that there was nothing in Petitioner's file to indicate the February 22, 2001 letter was returned as undeliverable. The administrative law judge based that determination on the fact that Petitioner failed to provide documentary evidence to demonstrate: (1) that the letter was returned to the Department as undeliverable; (2) that he was no longer living in Southwest Philadelphia in 2001; or (3) that the February 22, 2001 letter was sent to the wrong address. Finally, the administrative law judge denied *nunc pro tunc* relief, finding that Petitioner's testimony that he thought the case was expunged was not credible and reasoning that the delay in filing was due to Petitioner's own negligent

6

conduct. The Bureau adopted this recommendation and dismissed Petitioner's appeal in an order, dated August 29, 2016. This appeal followed.[5]

On appeal,[6] Petitioner contends that the Department violated his rights under the Pennsylvania Constitution and United States Constitution, as well as the Child Protective Services Law, by depriving Petitioner of a hearing. Petitioner argues that he "perfected his appeal" when he requested a hearing in his July 25, 2000 letter to the Department. (Pet'r's Br. at 7.) Petitioner also contends that he did not receive the August 8, 2000 or February 22, 2001 letters from the Department and that neither of these letters required any action because he had already perfected his appeal. Petitioner also points out that the Department maintains a policy to grant a hearing if a request for a hearing is ambiguous, and, thus, even if Petitioner's request was ambiguous, the Department violated its own policy by not granting him a hearing. Finally, Petitioner argues that the Department violated the Pennsylvania Constitution, the United States Constitution, and the Child Protective Services Law by denying Petitioner *nunc pro tunc* relief.[7]

In response, the Department argues that it did not deprive Petitioner of a hearing, but rather it followed the statutorily prescribed process for an appeal of an indicated report of abuse. The Department argues that Petitioner did not request

---

[5] Petitioner also filed a request for rehearing or reconsideration in the instant case, which the Bureau denied on September 30, 2016. Petitioner, however, does not appeal that determination.

[6] This Court's standard of review is limited to determining whether constitutional rights have been violated, an error of law was committed, or necessary findings of fact were unsupported by substantial evidence. *G.M. v. Dep't of Pub. Welfare*, 957 A.2d 377, 379 n.1 (Pa. Cmwlth. 2008), *appeal denied*, 973 A.2d 1008 (Pa. 2009).

[7] The Philadelphia DHS intervened in this matter.

7

a hearing until 2016, and, thus, his request was untimely. The Department argues that Petitioner did not meet his burden for *nunc pro tunc* relief, because the administrative law judge found not credible Petitioner's allegations that he did not receive the second and third letters from the Department and that he thought his case was expunged.

In addition to reiterating some of the Department's arguments, the Philadelphia DHS argues that this Court should exercise constitutional avoidance on Petitioner's due process claim. The Philadelphia DHS also argues that if this Court does address the question of whether lack of a pre-deprivation hearing violates due process, this Court should find that it does not.

## II. Due Process and the Child Protective Services Law

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Though not explicitly mentioned, the Pennsylvania Supreme Court has held that the guarantee of due process of law in Pennsylvania jurisprudence emanates from Article I, Sections 1, 9, and 11 of the Pennsylvania Constitution. *Lyness v. State Bd. of Med.*, 605 A.2d 1204, 1207 (Pa. 1992). The due process standards of United States and Pennsylvania Constitutions are essentially the same. *Muscarella v. Commonwealth*, 87 A.3d 966, 973 (Pa. Cmwlth. 2014). In terms of procedural due process, the basic elements are adequate notice, the opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case. *Commonwealth v. Turner*, 80 A.3d 754, 764 (Pa. 2013), *cert. denied*, 134 S. Ct. 1771 (2014). Courts examine procedural due process questions in two steps: the first asks whether there is a life, liberty, or property interest with which the state

8

has interfered, and the second examines whether the procedures attendant to that deprivation were constitutionally sufficient. *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

Placement on a registry for alleged child abuse causes damage to the alleged abuser, primarily in the form of reputational harm and employment repercussions. Reputation is expressly protected in Sections 1 and 11 of Article I of the Pennsylvania Constitution.[8] In the Commonwealth, reputation is "a fundamental interest which cannot be abridged without compliance with constitutional standards of due process and equal protection." *R. v. Dep't of Pub. Welfare*, 636 A.2d 142, 149 (Pa. 1994)*; see also In re J.B.*, 107 A.3d 1, 16 (Pa. 2014) ("[The Pennsylvania Supreme Court] has recognized that the right to reputation, although absent from the federal constitution, is a fundamental right under the Pennsylvania Constitution"). "In Pennsylvania, therefore, reputational

---

[8] Article I, Section 1 provides:

> All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness.

PA. Const. art. I, § 1.

> Article I, Section 11 provides:

> All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

PA. Const. art I, § 11.

9

harm alone is an affront to one's constitutional rights." *D.C. v. Dep't of Human Serv.*, 150 A.3d 558, 566 (Pa. Cmwlth. 2016).[9]

Having determined that Petitioner's placement on the ChildLine Registry implicated a protected liberty interest, we must determine if the procedure he received was constitutionally sufficient. Recently, in *D.C.*, this Court explained that the Child Protective Services Law enables the Department to place an alleged child abuser's name on the ChildLine Registry on the basis of an investigation by a county or the Department and not on the basis of an evidentiary hearing. *D.C.*, 150 A.3d at 562. We explained that, because an indicated report goes into the registry on the basis of the investigation alone, the alleged perpetrator suffers a loss to reputation and possibly employment, all without a hearing. *Id.* at 564. We expressed concern that the lack of a pre-deprivation hearing raises a serious due process question. *Id.* In *D.C.*, we also closely examined the Missouri Supreme Court's decision in *Jamison v. State of Missouri, Department of Social Services*,

---

[9] Outside of Pennsylvania, it is not always clear whether placement on a registry for child abuse will implicate a constitutionally protected liberty interest under the United States Supreme Court's precedent. In *Paul v. Davis*, 424 U.S. 693 (1976), the United States Supreme Court held that reputation, by itself, is not a protected liberty interest under the Fourteenth Amendment. *Paul*, 424 U.S. at 701. Following *Paul*, under the so-called "stigma plus" test, in order for reputational harm to implicate constitutional rights, the state action must affect some tangible liberty or property interest. *Id.* In *Smith ex rel. Smith v. Siegelman*, 322 F.3d 1290 (11th Cir. 2003), the Eleventh Circuit held that an alleged abuser did not satisfy the stigma plus test because he failed to show loss in employment or salary. *Smith*, 322 F.2d at 1297. Conversely, the Ninth Circuit held that two parents, erroneously placed on a child abuser database, did satisfy the stigma plus test under California's statute, due in part to the parents' inability to work in a child-related field. *Humphries v. Cnty. of Los Angeles*, 554 F.3d 1170 (9th Cir. 2009), *rev'd on other grounds*, *Los Angeles Cnty., California v. Humphries*, 562 U.S. 29 (2010). Because reputation is protected under the Pennsylvania Constitution, however, we have held that "the stigma plus analysis is not necessary" for a due process analysis concerning reputational harm. *D.C.*, 150 A.3d at 566.

10

218 S.W.3d 399 (Mo. 2007). There, the Missouri Supreme Court declared Missouri's version of the Child Protective Services Law unconstitutional for that exact reason—because the Missouri law did not provide for a pre-deprivation hearing.

Unlike Missouri, Pennsylvania has not yet answered the question of whether a pre-deprivation hearing is necessary to satisfy due process. Pennsylvania decisions have expressed serious misgivings about the Commonwealth's statutory scheme. Senior Judge Friedman expressed her concern in the following way:

> It shocks my conscience that the [Child Protective Services] Law would allow the investigating caseworker to render a de facto adjudication that is adverse to an individual's reputation *without* an independent adjudicator having had the opportunity to consider the investigator's evidence of child abuse in accordance with established procedures of due process. This is particularly so because unless, or until, the alleged abuser timely requests an expunction hearing, the names of the falsely accused may nevertheless be released to physicians, child advocates, courts, the General Assembly, the Attorney General, federal officials, county officials, law enforcement officials, the district attorney and others. Thus, by the time [the Department] orders the expunction of an indicated report, a person's reputation already may be tarnished erroneously.

*K.J. v. Dep't of Pub. Welfare*, 767 A.2d 609, 616 n.9 (Pa. Cmwlth.) (Friedman, J., dissenting) (emphasis in original), *appeal denied*, 788 A.2d 381 (Pa. 2001). More recently, in *G.V. v. Department of Public Welfare*, 91 A.3d 667 (Pa. 2014), Justice Saylor, now Chief Justice, concluded his concurrence by noting that "the inquiry into whether the Pennsylvania statute reflects adequate process remains seriously in question," adding that the current system "is in tension with the constitutional

11

preference for pre-deprivation process." *G.V.*, 91 A.3d at 674 n.1 (Saylor, J., concurring).[10]

In determining the sufficiency of the procedure, the Supreme Court's decision in *Mathews v. Eldridge*, 424 U.S. 319 (1976), instructs that three factors must be considered:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335. The Supreme Court has held "that *some form of hearing is required* before an individual is finally deprived of a [protected] interest" because "the right to be heard before being condemned to suffer grievous loss of any kind . . . is a principle basic to our society." *Id.* at 333 (emphasis added) (internal quotation omitted).

---

[10] Chief Justice Saylor's concurrence also highlighted troubling statistics, noting that the Bureau reversed 97% of cases decided on the merits. *G.V.*, 91 A.3d at 675-76. Other courts have likewise been troubled by high rates of reversal. *See Humphries*, 554 F.3d at 1200 (reasoning that rate of reversal in California could be as high as 50%, and, thus, many listed on child abuse registry have "legitimate basis for expungement" and "insufficient means for correcting those errors"); *Jamison*; 218 S.W.3d at 409 (determining that "[t]he high risk of an erroneous deprivation [(about 35-40% in Missouri)] provides an additional reason that investigation alone is insufficient to support placement on the [child abuse registry]"); *Dupuy v. Samuels*, 397 F.3d 493, 505 (7th Cir. 2005) (noting "the unacceptable 74.6 percent reversal rate for challenged indicated reports"); *Valmonte v. Bane*, 18 F.3d 992, 1003 (2d Cir. 1994) (describing that "nearly 75% of those who seek expungement of their names from the list are ultimately successful"). These high rates of reversal are troubling because there is arguably "no more deplorable badge of infamy a person can wear than that of being a child abuser." *See Jackson v. Marshall*, 454 S.E.2d 23, 27 (Va. Ct. App. 1995) (quotation omitted).

Petitioner was entitled to adequate notice and some form of a hearing. Initially, we note that the June 12, 2000 letter, notifying Petitioner of the indicated report, used the exact wording that this Court criticized in the past. In *C.S. v. Department of Public Welfare*, 879 A.2d 1274 (Pa. Cmwlth. 2005), another challenge by an alleged perpetrator of child abuse, the notice from the Department provided: "If this request is denied, perpetrators may have a right to a hearing." *C.S.*, 879 A.2d at 1277 (emphasis omitted). We held that the use of the word "may" rendered the notice equivocal, thus constituting a breakdown of administrative procedure that justified *nunc pro tunc* relief. *Id*. at 1280. Here, by using the same wording used in *C.S.*, the notice in the June 12, 2000 letter is equally equivocal. Additionally, the June 12, 2000 letter does not appear to give any indication that Petitioner would be listed on the ChildLine Registry. (*See* R.R. at 13a.) The letter simply provides that the Department will maintain a file on petitioner. Petitioner does not, however, argue that the June 12, 2000 letter was equivocal, so as to justify *nunc pro tunc* relief, or inadequate, so as to violate due process.[11] Accordingly, because we need not determine whether the June 12, 2000 letter provided "adequate notice" in terms of due process, we proceed to the question of whether Petitioner was afforded "some form of hearing." *See Mathews*, 424 U.S. at 333.

---

[11] Petitioner does argue, curiously citing *D.C.* rather than *C.S.*, that the notice in the June 12, 2000 letter was equivocal, but he only does so in his reply to the Department's brief. Accordingly, he waived that issue. *Commonwealth v. Basemore*, 744 A.2d 717, 726-27 (Pa. 2000) ("A reply brief, however, is an inappropriate means for presenting a new and substantively different issue than that addressed in the original brief").

We need not apply the *Mathews* test to determine the constitutionality of Pennsylvania's current process under the Child Protective Services Law—providing a post-deprivation rather than a pre-deprivation hearing—because here, the Department violated Petitioner's right to due process by not providing *any* form of a hearing. In his July 25, 2000 letter to the Department, Petitioner requested the indicated report be "destroyed or amended" and added, "[i]f a hearing is necessary, I would like one." (R.R. at 14a.) Though conditionally stated, this was nonetheless a clear request for a hearing. The administrative law judge's position that "it is not necessary to have a hearing to amend or destroy an indicated report," (R.R. at 43a), is unpersuasive, because Petitioner is not speaking about the procedure as it applies to all perpetrators, generally, but rather as it applies to him. Petitioner begins the letter by asking for the indicated report to be expunged. The condition he places on the hearing request is, essentially, in the event that the indicated report is not expunged then he would like a hearing. More importantly, an ambiguous statement by a named perpetrator is a very weak ground on which to base denial of a hearing to which Petitioner had "an absolute right." *C.S.*, 879 A.2d at 1280. Petitioner requested a hearing, but he was never afforded one. The Department should have provided Petitioner some form of a hearing, and its failure to do so resulted in Petitioner's name being placed on the ChildLine Registry for over 17 years.

The remaining arguments from the Department and the Philadelphia DHS involve constitutional avoidance,[12] justiciability, and waiver. Constitutional

---

[12] "[W]hen faced with a case raising constitutional and non-constitutional grounds, a court must decide the matter on non-constitutional grounds and avoid constitutional questions if **(Footnote continued on next page…)**

avoidance is inappropriate in this case because we simply must address the Department's failure to provide a hearing. While we prefer to avoid constitutional questions when possible, here the due process question, the lack of any form of hearing, is the central issue and primary cause of Petitioner's grievance. The Philadelphia DHS argues that we should decide the matter on other procedural grounds, either timeliness or *nunc pro tunc* relief, but in this case, both are inextricably intertwined with procedural due process. Similarly, this issue is plainly justiciable. As we have already discussed, several state and federal courts have already addressed the very issue of due process and placement on a child abuse registry. Finally, the Department's and the Philadelphia DHS's arguments regarding waiver are unpersuasive. Though Petitioner may have waived his argument regarding the necessity for a *pre*-deprivation hearing under the Fourteenth Amendment, Petitioner and his counsel always maintained that Petitioner had a due process right to a hearing, regardless of sequence.

The Department's failure to provide a hearing resulted in a violation of Petitioner's right to due process. Accordingly, we reverse the decision by the Bureau and remand the matter to the Bureau with instruction to conduct a hearing on the merits of Petitioner's appeal.

_____
P. KEVIN BROBSON, Judge

_____
**(continued…)**

possible." *Dauphin Cnty. Soc. Serv. for Children and Youth v. Dep't of Pub. Welfare*, 855 A.2d 159, 165 (Pa. Cmwlth. 2004).

15

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| J.P., | : | **SEALED CASE** |
| Petitioner | : | |
| | : | |
| v. | : | No. 1602 C.D. 2016 |
| | : | |
| Department of Human Services, | : | |
| Respondent | : | |

# **O R D E R**

AND NOW, this 12th day of September, 2017, the adjudication of the Department of Human Services, Bureau of Hearings and Appeals (Bureau), is REVERSED.  The matter is REMANDED to the Bureau for further proceedings in accordance with this opinion.

Jurisdiction relinquished.

---
P. KEVIN BROBSON, Judge