# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lance Grimes,       :
       Petitioner  :  **CASE SEALED**
           :
  v.        :  No. 1365 C.D. 2018
           :  Argued:  June 6, 2019
Department of Education,   :
       Respondent :


BEFORE: HONORABLE P. KEVIN BROBSON, Judge
     HONORABLE ANNE E. COVEY, Judge
     HONORABLE ELLEN CEISLER, Judge


**OPINION BY JUDGE BROBSON**   **FILED:  July 12, 2019**


Petitioner Lance Grimes (Grimes) petitions for review of an adjudication by the Professional Standards and Practices Commission (Commission), concluding that Grimes's conduct constituted immorality pursuant to the Educator Discipline Act (Act)[1] and directing the Department of Education (Department) to issue a public reprimand to Grimes.  For the reasons that follow, we affirm.

## I. BACKGROUND

Grimes maintains an "Instructional I" teaching certificate in "Special Education PK-12 and Elementary K-6."  (Reproduced Record (R.R.) at 21a.)  The Altoona Area School District (School District) employed Grimes as an elementary school teacher in August 2009, and Grimes began teaching in the field of special education at Altoona Area Junior High School (School) in 2010.  (*Id.*)  The School

---

[1] Act of December 12, 1973, P.L. 397, *as amended*, 24 P.S. §§ 2070.1a-.18c.

District suspended Grimes from teaching in that district in 2015 because Grimes falsified certain students' records, failed to attend scheduled faculty meetings, and damaged school equipment by punching a laptop and printer in anger. (*Id.* at 28a-29a.) Grimes resigned, and he and the School District entered into an agreement relating to his separation from employment (Release Agreement). (*Id.* at 10a-12a.)

The Department initiated its action against Grimes on December 6, 2016, by filing a notice of charges with the Commission, averring that Grimes's actions constituted immorality, incompetence, negligence, and intemperance under the Act.[2] (*Id.* at 81a.) Grimes filed a reply to the notice of charges, new matter, and a motion to dismiss on January 9, 2017. (Certified Record (C.R.), Item No. 3.) The Commission denied Grimes's motion to dismiss by order dated January 10, 2017. (C.R., Item No. 5.) The Commission appointed hearing officer Maria Battista (Hearing Officer Battista) on January 12, 2017. (C.R., Item No. 6.) On March 21, 2017, Grimes filed a motion *in limine* and a memorandum of law in support thereof, requesting that "all evidence and testimony arising out of [Grimes's Release Agreement, which he characterized as a] confidential settlement agreement[,] be excluded from any decision or hearing in this case." (C.R., Item

---

[2] Section 9.3(a) of the Act, 24 P.S. § 2070.9c(a) provides, in relevant part:

The [C]ommission shall direct the department to impose discipline against any educator for conduct found by the [C]ommission to constitute:

   (1) Immorality.

   (2) Incompetency.

   (3) Intemperance.

   . . . .

   (5) Negligence.

No. 10 at 1.) Grimes filed an amended motion *in limine* and memorandum of law in support on April 28, 2017. (R.R. at 1a-13a.) By order dated May 26, 2017, Hearing Officer Battista denied Grimes's amended motion *in limine*. (*Id.* at 14a-15a.) On May 30, 2017, the Commission appointed a new hearing officer, Christopher McNally (Hearing Officer McNally), who conducted a hearing on this matter on July 13, 2017, and July 14, 2017. (C.R., Item No. 24; R.R. at 18a.) After the hearing, Hearing Officer McNally issued a proposed report to the Commission that included findings of fact and conclusions of law. (R.R. at 17a-71a.) For the purposes of this appeal, we focus on the findings of fact addressing Grimes's conduct with respect to the Department's charge of immorality.

The relevant findings of fact reveal that during the 2014-2015 school year, Grimes functioned as a special education teacher for the eighth grade and as an Individualized Education Program (IEP) case manager. (*Id*. at 21a.) An IEP is "a statement of the assessment, curriculum, instruction, and activities to be used by teachers, administrators, parents[,] and the student with disabilities to allow the student to advance appropriately." (*Id*. at 21a-22a.) Part of Grimes's job duties required him to schedule IEP meetings, implement students' IEPs, conduct annual IEP meetings, confirm students' receipt of services listed in their IEPs, update IEPs, communicate with students' parents, keep track of students' progress, and coordinate lessons. (*Id.* at 21a-22a.)

When students with disabilities reach the age of fourteen, each student is entitled to "transition activities and services." (*Id.* at 23a.) One such transition service is a transition interview, which is conducted by the Transition Coordinator prior to an IEP meeting. (*Id*.) In the transition interview, the Transition Coordinator inquires about each student's postsecondary education plans, employment plans,

3

independent living goals, and how the student plans to achieve said goals. (*Id.*) The Transition Coordinator uses the data collected in the transition interview to create a transition plan. (*Id.*) These transition plans are required under the federal regulations related to the development of IEPs.[3] (*Id.*) "[Grimes] and other special education teachers in the School District are not authorized to perform transition surveys." (*Id.*)

Patti Wendle is the Transition Coordinator for the School District. (*Id.*) Each academic year, the School sends each special education teacher an information packet that includes an IEP manual covering the School's transition survey policies and procedures and the contact information for Ms. Wendle in her role as the Transition Coordinator.[4] (*Id.* at 23a-24a.) Ms. Wendle requires special education teachers to provide her with a two-week notice period before a scheduled IEP meeting is conducted, so that she can conduct the transition interview and create the transition plan before the IEP meeting. (*Id.* at 24a.) Grimes is aware of Ms. Wendle's request that teachers provide her with two-weeks' notice prior to a scheduled IEP meeting. (*Id.*) Grimes's conduct at issue related to IEPs for three students whom we will refer to as A.O., J.M., and B.R. (*Id.* at 25a.) Previously, Ms. Wendle met with J.M. and B.R., when both students were in seventh grade, and conducted the required transition process.[5] (*Id.* at 25a-26a.) When A.O., J.M., and

---

[3] *See* 34 C.F.R. §§ 300.320-.323.

[4] Ms. Wendle's contact information is listed as part of an instruction in the IEP manual providing: "If a child will be turning [fourteen] or older during the duration of the IEP, contact the Transition Coordinator so she can assist you developing an appropriate transition plan. The Transition Coordinator for the [School] is [Ms.] Wendle." The IEP manual also provided the email address at which Ms. Wendle could be contacted. (Reproduced Record (R.R.) at 24a.)

[5] Ms. Wendle did not meet with A.O. when he was in seventh grade because he was not yet fourteen years old.

4

B.R. were in eighth grade, Grimes scheduled IEP meetings with each of them. (*Id.* at 25a.) Prior to the IEP meetings, which were to be conducted on February 3, 2015, Grimes reviewed each student's IEP and noticed that the transition section was not yet completed; however, Grimes did not ask Ms. Wendle to conduct the transition process. (*Id.* at 25a, 27a.) Grimes, instead, completed the transition plans in the IEP of each student and inserted Ms. Wendle's name and a date into the transition plans in such a way as to create the appearance that Ms. Wendle completed the transition plans. (*Id.* at 25a-27a.) Where A.O.'s transition plan is concerned, Grimes created the transition plan himself. (*Id.* at 25a.) With respect to J.M.'s and B.R.'s transition plans, Grimes accessed the transition plans that Ms. Wendle completed in the prior year and filled that current year's transition plans with the prior year's data.[6] (*Id*. at 26a-27a.)

Ms. Wendle discovered that Grimes completed the transition plans for the IEPs of A.O., J.M., and B.R. and reported the matter to Harry Gregg, who was the School's special education supervisor at the time. (*Id.* at 27a.) Mr. Gregg reported the incident to Brad Hatch, the principal for the eighth grade at the time, who conducted an investigation into the matter. (*Id.*) Grimes admitted that he did not ask Ms. Wendle to conduct the transition process and that he revised the transition plans for students A.O., J.M., and B.R. to make it seem as though Ms. Wendle completed them herself. (*Id*. at 27a, 376a-77a.) Ms. Wendle has since interviewed all three students and revised the transition plans for their IEPs. (*Id.* at 28a.) On June 5, 2015, the School District suspended Grimes from teaching

---

[6] IEPs are created in a software program called IEP Writer, to which each case manager has access, but only with respect to the case manager's assigned students. (R.R. at 22a.) Case managers have the option to create a new IEP or to open old IEPs that contain the student's information from the prior year. (*Id.*)

in that district indefinitely and issued a statement of charges to Grimes. (*Id.*) Grimes resigned from the School District on June 15, 2015. (*Id.*) The School District settled with Grimes to remove references to any disciplinary matters from Grimes's personnel file and agreed to provide a neutral reference to prospective employers. (*Id.* at 32a.)

With respect to the Department's charge against Grimes for immorality, Hearing Officer McNally concluded that Grimes's actions did not constitute immorality because the Department did not meet its burden of proving that Grimes's falsification of students' records offends the morals of the Commonwealth. (*Id.* at 33a.) Hearing Officer McNally also concluded that the Department failed to prove that Grimes's conduct constituted incompetence, negligence, or intemperance. (*Id.*) Hearing Officer McNally, therefore, recommended dismissal of the Department's notice of charges. (*Id.* at 70a.) The Department filed exceptions to the proposed report, challenging Hearing Officer McNally's conclusion that the Department did not prove immorality, incompetence, negligence, and intemperance with respect to Grimes's actions. (C.R., Item No. 34 at 3.) The Department also argued that Hearing Officer McNally should have included certain crucial findings of fact in the proposed report. (*Id.* at 18.)

On September 10, 2018, the Commission issued its final order and a memorandum in support thereof. (C.R., Item No. 36.) In its final order, the Commission modified Hearing Officer McNally's proposed order by concluding that the Department proved Grimes's acts constituted immorality and directing the Department to issue a public reprimand to Grimes. (*Id.* at 10.) In its memorandum, the Commission adopted Hearing Officer McNally's findings of fact and added three more findings:

6

A. [Grimes] wrote Patti Wendle's name under the section that states "written input received by the following members" on the IEP Team Signatures page of A.O.'s [eighth] grade IEP.

B. [Grimes] wrote Patti Wendle's name under the section that states "written input received by the following members" on the IEP Team Signatures page of J.M.'s [eighth] grade IEP.

C. [Grimes] wrote Patti Wendle's name under the section that states "written input received by the following members" on the IEP Team Signatures page of B.R.'s [eighth] grade IEP.

(*Id*. at 4-5 (citations omitted).)  The Commission also adopted Hearing Officer McNally's conclusions of law with respect to the Department's charges of incompetence, negligence, and intemperance.  (*Id*. at 5-6 n.3.)  Concerning the charge of immorality, however, the Commission concluded that the Department sustained its burden to prove that Grimes's acts offended the morals of the Commonwealth.  (*Id.* at 8-9.)  In coming to its conclusion, the Commission stated that it is responsible for setting the moral standards of the Commonwealth and may, therefore, determine what types of conduct offend those morals and set bad examples for students.  (*Id.* at 6.)  Grimes then filed the instant petition with this Court.

## II.    ISSUES

On appeal,[7] Grimes advances three arguments:  (1) the Commission committed an error of law when it denied Grimes's motion *in limine* to exclude all evidence related to the Release Agreement from consideration; (2) the Commission

---

[7] This Court's standard of review of an order of the Commission is limited to considering whether the Commission committed an error of law or violated any constitutional rights and whether any necessary factual findings are not supported by substantial evidence.  2 Pa. C.S. § 704; *Bowalick v. Dep't of Educ.*, 840 A.2d 519, 522 n.2 (Pa. Cmwlth. 2004).

committed an error of law in concluding that the Department met its burden of proving Grimes's falsification of students' IEPs constituted immorality under the Act; and (3) the Commission's direction that the Department issue a public reprimand to Grimes is excessive because he has already been suspended from teaching since 2015.

## III. DISCUSSION

### A. Motion In Limine

Grimes first argues that the Commission erroneously dismissed his motion *in limine* to exclude all evidence related to the Release Agreement from consideration. Specifically, Grimes argues that the Commission should not have considered such evidence where: (1) the School District illegally submitted evidence by supplying witness testimony concerning Grimes's actions in violation of the non-disclosure terms of the Release Agreement; (2) the doctrine of equitable estoppel precludes the Department from using the witness testimony supplied by the School District in violation of the Release Agreement; and (3) the Department and Commission violated Grimes's due process rights under the United States Constitution[8] and Pennsylvania Constitution by allowing the School District witnesses to testify concerning Grimes's actions.[9] The Department responds by stating that it is not a party to the Release Agreement, and, therefore, the arguments of breach of contract and preclusion by the doctrine of equitable estoppel are inapplicable to the Department. Further, the Department contends that it complied with all the requirements of due process during the disciplinary proceedings. Lastly,

---

[8] *See* U.S. Const. amend. XIV, § 1.

[9] *See* Pa. Const. art. I, §§ 1, 9, 11.

the Department argues that Section 9.1(a)(4) of the Act[10] and Section 11(c) of the Act[11] required the School District to supply relevant evidence—*i.e.*, the witness testimony—to the Department.

Where an appellate court reviews the denial of a motion *in limine*, our courts apply "an evidentiary abuse of discretion standard of review." *Cmwlth. v. Hoover*, 107 A.3d 723, 729 (Pa. 2014) (quoting *Cmwlth. v. Rivera*, 983 A.2d 1211, 1228 (Pa. 2009)). In order for an appellate court to find that the tribunal abused its discretion in making the evidentiary ruling, the appellate court must find that the ruling was manifestly unreasonable, partial, prejudiced, biased, based on ill-will, or lacks such support as to constitute a clear error. *Id.*

### 1. Breach of Contract

Grimes contends that the Commission abused its discretion in denying the motion *in limine* because the Commission considered illegally obtained evidence where the School District allegedly breached its contractual obligations by offering witness testimony concerning Grimes's actions as evidence. The School District, however, had a duty to report Grimes's separation from the School to the Department pursuant to Section 9.1(a)(4) of the Act, which provides:

> (a)     *The chief school administrator or his designee shall file all of the following information with the department* in writing on a form described by the department:
>
> . . . .
>
> (4) [Information concerning] [a]ny educator who has resigned, retired[,] or otherwise separated from

---

[10] Added by the Act of December 20, 2000, P.L. 918, 24 P.S. § 2070.9a(a)(4).

[11] Added by the Act of December 14, 1989, P.L. 612, 24 P.S. § 2070.11(c).

employment after a school entity has received information of alleged misconduct under this [A]ct.

(Emphasis added.) Further, Section 11(c) of the Act, which addresses the duties of school entities concerning disciplinary proceedings, requires such school entities to "cooperate with the [D]epartment during its review, investigation or prosecution and promptly . . . provide the [D]epartment with any relevant information and documentary and physical evidence that the [D]epartment may reasonably request." Also, Section 11(e) of the Act, prohibits school entities from entering into agreements with educators that require school entities to forego the duties in the Act and declares any such agreement to be void and unenforceable.

We may infer from the evidence of record that the Department began to investigate Grimes's actions because the School District complied with the mandatory reporting requirements of Section 9.1(a)(4) of the Act. The School District would, therefore, have an obligation to assist the Department with the investigation by submitting evidence related to this matter. Witness testimony concerning Grimes's actions is, quite clearly, relevant to the matter. Further, the Release Agreement cannot preclude the School District from fulfilling its obligations under the Act pursuant to Section 11(e) of the Act. The evidence of record does not, therefore, indicate that the Department initiated disciplinary proceedings against Grimes based on illegally obtained evidence.

Note that this conclusion relates only to Grimes's contention that the *Commission* reviewed evidence that was illegally obtained. We do not reach the remainder of Grimes's argument because it requires a conclusion as to whether the School District breached the contractual obligations created by the Release Agreement. Due to the fact that the School District is not a party to this action and the matter before us is simply a petition to review the Commission's adjudication,

10

this is the incorrect forum to seek relief on any breach of contract claim Grimes may wish to assert against the School District.[12] Grimes's breach of contract argument is, therefore, without merit.

## *2. Equitable Estoppel*

Grimes also argues that the Commission committed an abuse of discretion in denying Grimes's motion *in limine*, because the doctrine of equitable estoppel precludes the Department from using the witness testimony supplied by the School District in violation of the Release Agreement. Grimes's contention focuses on the notion that the School District somehow violated the Release Agreement by allowing its employees to testify about Grimes's complained of conduct. This argument fails for the reasons discussed above, as the School District was statutorily obligated to report misconduct and cooperate with the Department, regardless of any agreement between Grimes and the School District.

---

[12] Grimes fails to identify which specific term in the Release Agreement the School District violated. Based on our review of the Release Agreement, it appears that Grimes may be basing his argument on the following provision:

> *To the extent permitted by law*, the parties agree and represent that the existence of any *terms* of this [Release] Agreement are and shall remain confidential with the exception of disclosure by the [School] District to its attorneys and auditors and disclosure by [Grimes] to his attorneys, tax professionals, and members of his immediate family. All parties further agree that *to the extent permitted by law*, they will not disclose this [Release] Agreement or the contents thereof, to any person with whom they have contact, and will use their best efforts to ensure that any such contacted person will not violate the letter and spirit of this provision.

(R.R. at 11a (emphasis added.)) Thus, pursuant to the Release Agreement, neither party is permitted to disclose the *terms* of the Release Agreement, except *to the extent permitted by law*. We note that the terms of the Release Agreement make no mention of Grimes's complained of conduct. Further, the Release Agreement does not preclude disclosure of its terms outright; rather, it recognizes that in some instances the law may require disclosure of the Release Agreement and its terms. A mandatory report under Section 9.1(a)(4) of the Act could constitute such an instance.

11

Furthermore, the doctrine of equitable estoppel is not applicable here. "[E]quitable estoppel recognizes that an informal promise implied by one's words, deeds or representations which leads another to rely justifiably thereon to his own injury or detriment, may be enforced in equity." *Novelty Knitting Mills, Inc. v. Siskind*, 457 A.2d 502, 503 (Pa. 1983). To the extent that Grimes contends the Department induced him to believe that the terms of the Release Agreement would not be disclosed, there is no evidence of record to support such an assertion. If Grimes is, instead, asserting that the School District induced him—by entering into the Release Agreement—to believe that the School District would not disclose Grimes's actions leading up to Grimes's discipline, such an argument may not be resolved in this forum. Grimes's argument on this point, therefore, has no merit.

*3. Due Process*

Grimes next argues that the Commission committed an abuse of discretion in denying Grimes's motion *in limine* because the Department and Commission violated Grimes's due process rights under the United States Constitution and Pennsylvania Constitution by allowing the School District witnesses to testify concerning Grimes's actions. In *J.P. v. Department of Human Services*, 170 A.3d 575 (Pa. Cmwlth. 2017), this Court set forth the principles that govern procedural due process inquiries:

> The Due Process Clause of the Fourteenth Amendment provides that no State shall 'deprive any person of life, liberty, or property, without due process of law.' Though not explicitly mentioned, the Pennsylvania Supreme Court has held that the guarantee of due process of law in Pennsylvania jurisprudence emanates from Article I, Sections 1, 9, and 11 of the Pennsylvania Constitution. The due process standards of [the] United States and Pennsylvania Constitutions are essentially the same. In terms of procedural due process, the basic

12

elements are adequate notice, the opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case. Courts examine procedural due process questions in two steps: the first asks whether there is a life, liberty, or property interest with which the state has interfered, and the second examines whether the procedures attendant to that deprivation were constitutionally sufficient.

*J.P.*, 170 A.3d at 580-81 (citations omitted). As stated above, the initial question our courts ask is whether a life, liberty, or property interest is at stake. *Id.* Under the Pennsylvania Constitution, each person in this Commonwealth has a protected interest in the practice of his or her chosen profession. *Khan v. State Bd. of Auctioneer Exam'rs*, 842 A.2d 936, 946 (Pa. 2004). When an individual acquires a license to practice a profession, the licensed individual has a protected property right in the practice of his or her chosen profession. *Id.* The protections given to the right to practice a profession are, however, "subject to the lawful exercise of the power of the State to protect the public health, safety, welfare, and *morals* by promulgating laws and regulations that reasonably regulate occupations." *Id.* (emphasis added). Once we determine the nature of the interest that is at stake, we turn to the second question—*i.e.*, whether the State provided the individual being deprived of a protected interest with: (1) adequate notice; (2) an opportunity to be heard; and (3) an opportunity to defend himself or herself before an impartial adjudicator. *J.P.*, 170 A.3d at 580.

Here, Grimes has a protected property right in the practice of the teaching profession. The Department and Commission have, however, complied with procedural due process procedures in the instant disciplinary action. The Department provided Grimes with a notice of charges. (R.R. at 81a.) The Commission conducted a hearing where Grimes was represented by counsel, given

13

the opportunity to cross-examine witnesses, and given the chance to testify and present witnesses in his defense. (*Id.* at 18a-19a.) The Department and the Commission did not, therefore, violate Grimes's due process rights, and Grimes's argument on this point has no merit. Accordingly, the Commission did not commit an error of law by denying Grimes's motion *in limine*.

## B. Immorality Under the Act

Grimes's next contention on appeal is that the Commission erred in concluding that the Department met its burden of proving that Grimes's falsification of students' IEPs constituted immorality under the Act. In support of this contention, Grimes relies upon *McFerren v. Farrell Area School District*, 993 A.2d 344 (Pa. Cmwlth.), *appeal denied*, 12 A.3d 372 (Pa. 2010), for the proposition that where immorality is unproven the charge may not stand. The Department responds by arguing that the Commission properly concluded that the Department proved that Grimes's falsification of students' IEPs offended the morals of the Commonwealth and, therefore, constituted immorality under the Act.

In *McFerren*, this Court considered a high school principal's petition for review of an adjudication by the Secretary of Education, affirming a school district's termination of the principal's employment under the Public School Code of 1949 (Public School Code).[13] The complained of acts occurred in a meeting between the principal, a student, and the student's parent, all of whom are of African-American descent. During that meeting, in addressing the student's complaints about his previous suspension, the principal explained to the student that a suspension from school is not as difficult as the challenges the student will face in the real world. The principal explained the above-stated sentiment in these words:

---

[13] Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§ 1-101 to 27-2702.

14

"you know what [Student], the white man [is] going to kick your ass." *McFerren*, 993 A.2d at 349. The school district subsequently suspended the principal from the school district. The Department issued charges against the principal, including immorality. The Secretary concluded that the principal's statements to the student were *per se* immoral due to the racial implications therein. The Secretary determined that, although the school district did not provide evidence that the statement at issue offended the morals of the community, the statement was so offensive that it is immoral and sets a bad example to students.

This Court disagreed with the Secretary's conclusion and, instead, held that the principal's conduct did not constitute immorality. In coming to its conclusion, this Court discussed the definition of immorality as expressed by our appellate courts when deciding termination cases governed by the Public School Code. Immorality, in such cases, has been defined as "conduct that 'offends the morals of the community and is a bad example to the youth whose ideals a teacher is supposed to foster and to elevate.'" *McFerren*, 993 A.2d at 353 (quoting *Horosko v. Sch. Dist. of Mt. Pleasant Twp.*, 6 A.2d 866, 868 (Pa. 1939)). Further, "the moral standards of the community will not be presumed; they must be proved by substantial evidence." *Id*. at 354. This Court concluded that case law in which acts were found to be *per se* immoral involved certain crimes of moral turpitude. *Id.* at 354-55. The principal did not commit a crime, and, therefore, this Court found no precedent that could support a conclusion that the statement at issue was *per se* immoral. *Id*. at 355. Accordingly, due to the school district's failure to submit evidence proving that the principal's comments offended the morals of the community, the Secretary committed an error of law in finding the principal's conduct to be immoral. *Id.* at 356.

*McFerren* is inapposite to the case before us. Here, the Commission concluded that the Department met its burden of proving that Grimes's conduct constituted immorality under the Act by: (1) offering the testimony of employees of the School District, which avers that Grimes's falsification of students' IEPs offended them and was immoral to them; and (2) providing case law in which this Court and the Commission found acts of dishonesty to offend the morals of this Commonwealth. In contrast, the school district in *McFerren* offered no evidence whatsoever to prove that the principal's actions offended the morals of the community.

We now consider whether the Department's proffered evidence was sufficient to prove that Grimes's actions constituted immorality under the Act. Section 9.3(a) of the Act requires that the Commission direct the Department to discipline any educator who is found—by the Commission—to have committed acts that constitute, *inter alia*, immorality. The Act does not provide definitions for these offenses but instead requires the Commission to establish the definitions. 24 P.S. § 2070.9c(b). To that end, the Commission has defined "immorality" as "conduct which offends the morals of the Commonwealth and is a bad example to the youth whose ideals a professional educator . . . has a duty to foster and elevate." 22 Pa. Code § 237.3. This definition is similar to the one discussed in cases of this Commonwealth that deal with terminations under Section 1122 of the Public School Code, 24 P.S. § 11-1122—*i.e.*, conduct that offends the morals of the community. *See McFerren*, 993 A.2d at 353; *Kinnery v. Abington Sch. Dist.*, 673 A.2d 429, 432 (Pa. Cmwlth. 1996); *Balog v. McKeesport Area Sch. Dist.*, 484 A.2d 198, 200 (Pa. Cmwlth. 1984); *Bethel Park Sch. Dist. v. Krall*, 445 A.2d 1377, 1378 (Pa. Cmwlth. 1982). Though the language is different, in that the cases that apply

16

the Commission's definition of immorality require a finding that the acts at issue violated the morals of the *Commonwealth* as opposed to the *community*, the termination cases are persuasive as to what actions may offend the morals of the Commonwealth.

In *Balog*, this Court reviewed a final order of the Secretary that affirmed a school district's termination of an instructor. The instructor, in relevant part, made false statements to staff at the school district concerning whether he was in the school building while a robbery was in progress in the building. The school district terminated the instructor's employment. It appears that the Secretary found that the instructor's actions in this respect constituted immorality, and this Court agreed. Accordingly, this Court concluded that the instructor's actions constituted immorality because "[i]mmoral conduct may include lying." *Balog*, 484 A.2d at 200.

In *Bethel Park School District*, this Court determined whether the Secretary committed an error of law in sustaining a school district employee's appeal from the school district's decision to dismiss her on the basis of immoral conduct. The school district employee, having previously requested and been denied personal paid time off to attend conferences unrelated to work, attended one such conference without requesting time off. When the school district employee returned to work, she submitted a report of excused absences listing illness as the reason for her failure to report to work. The school district employee's doctor eventually informed the school district of the school district employee's misrepresentation, and the school district terminated her employment on the basis of immorality. The school district employee appealed the matter to the Secretary, who determined that the school district employee did not act immorally. This Court disagreed, stating that

17

"questions of morality . . . may include lying." *Bethel Park Sch. Dist.*, 445 A.2d at 1378. In dismissal cases, if a reasonable person would have reached the same result—*i.e.*, to terminate the individual—then the decision to terminate should stand. *Id.* at 1378-79. Accordingly, this Court vacated the Secretary's order and reinstated the school district's decision to terminate the school district employee.

In this case, the undisputed evidence shows that Grimes inserted Ms. Wendle's name and a date into students' IEP transition plans when Ms. Wendle is the only individual with the authority to do so and also committed these acts with the intent to deceive the reader into believing that Ms. Wendle completed the transition plans. (R.R. at 25a-27a.) These actions are more egregious than simply lying to staff of the school district, as in *Balog*, and lying on an excused absence form as in *Bethel Park School District*. Grimes falsified federally mandated IEPs to create the impression that Ms. Wendle completed the transition process herself.[14] Based on the factual findings and the state of the law, the Commission did not err in concluding that Grimes's conduct offended the morals of the Commonwealth and constituted immorality.

## C. Excessiveness of Public Reprimand

Grimes's final argument is that, in light of the fact that he has been suspended from the teaching profession since 2015, the Commission's demand that the Department issue a public reprimand to Grimes is excessive. Grimes also contends that the public reprimand will bar him from being employed as a teacher in the future. To begin with, there is no evidence of record that indicates that the Commission ever suspended Grimes's license. Rather, the School District merely

---

[14] *See* R.R. at 32a, Finding of Fact (F.F.) 76. We note that this finding of fact remains unchallenged on appeal.

suspended Grimes from teaching within that district, and Grimes then resigned from his employment. (R.R. at 10a, 28a.) Further, as stated earlier in this opinion, the Commission is required to direct the Department to impose disciplinary measures on any educator who is found by the Commission to have committed acts that constitute, *inter alia*, immorality. 24 P.S. § 2070.9c(a). Section 1.2 of the Act, added by the Act of December 20, 2000, P.L. 918, 24 P.S. § 2070.1b, includes public reprimand within the definition of "discipline."[15] The Commission is, therefore, well within its right to impose this disciplinary measure. In light of the facts of this case, the Commission's order does not impose an excessive disciplinary measure.

## IV. CONCLUSION

Based on the discussion above, we affirm the Commission's adjudication.

P. KEVIN BROBSON, Judge

---

[15] Section 1.2 of the Act defines "discipline" as:

(1) Private reprimand.

(2) Public reprimand.

(3) Suspension.

(4) Revocation.

(5) Surrender.

(6) Supplemental sanctions.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lance Grimes,                          :
                Petitioner    :    **CASE SEALED**
                              :
      v.                   :    No. 1365 C.D. 2018
                              :
Department of Education,               :
            Respondent    :

## O R D E R

AND NOW, this 12th day of July, 2019, the order of the Pennsylvania Professional Standards and Practices Commission (Commission) is hereby AFFIRMED.

Because this Court intends to report this opinion should "proceedings result[] in public discipline," such that the confidentiality requirements of Section 17.2(a) of the Educator Discipline Act (the Act)[16] become inapplicable, the Department of Education, after the matter has been completed and all available

---

[16] Act of December 12, 1973, P.L. 397, *as amended*, added by Act of December 18, 2013, P.L. 1205, 24 P.S. § 2070.17b(a), imposes confidentiality and provides, in part, as follows:

> [A]ll information *relating to any complaints or any proceedings* relating to or resulting from such complaints, including the identity of the complainant, *shall remain confidential*, unless or until discipline is imposed, other than a private reprimand or a supplemental sanction deemed private by the commission . . . . *All records pertaining to proceedings resulting in public discipline, excluding those records that are privileged or otherwise protected from release, shall become public after the exhaustion of all appeals* except where the [C]ommission has determined that immediate discipline is necessary. Records pertaining to immediate discipline proceedings are public at the time that the immediate discipline is imposed.

(Emphasis added.)

appeal rights have been exhausted, is directed to inform this Court as to whether discipline has been imposed such that the opinion may be reported in accordance with Section 17.2(a) of the Act.


_____
P. KEVIN BROBSON, Judge